LOUIS D. BLICK AND ANNE BLICK, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 62553. Filed December 31, 1958.

*Harry Weltchek, Esq.,* and *Bertram Gittler, Esq.,* for the petitioners.
*Henry L. Glenn, Esq.,* for the respondent.

FORRESTER, *Judge:* Respondent has determined a deficiency in the income tax of petitioners for their taxable year 1951 in the amount of $26,657.18. The issue is whether respondent erred in disallowing to a certain gain realized by petitioners the treatment provided in section 117 (b) of the Internal Revenue Code of 1939.[1]

### FINDINGS OF FACT.

Petitioners, husband and wife, reside in Elizabeth, New Jersey. Their return for the taxable year 1951 was filed with the director of internal revenue at Newark, New Jersey. Anne Blick did not actively participate in any pertinent transaction, and the designations "petitioner" and "Blick" will hereinafter refer to Louis D. Blick.

[1] SEC. 117. CAPITAL GAINS AND LOSSES.
(b) DEDUCTION FROM GROSS INCOME.—In the case of a taxpayer other than a corporation, if for any taxable year the net long-term capital gain exceeds the net short-term capital loss, 50 per centum of the amount of such excess shall be a deduction from gross income. * * *

In late 1948 and during 1949 petitioner acquired 7 options or contracts to purchase, covering 9 separate parcels of real estate in Plainfield, New Jersey. Each was in form a contract of purchase and sale, but limited petitioner's liability for nonperformance to forfeiture of the relatively small deposit. The separate tracts involved comprised one larger parcel with a frontage from the corner of East Front Street and Elm Place of 358.4 feet on Elm Place and 261.97 feet on East Front Street. In addition, a parcel owned by the First Presbyterian Church (hereinafter called the church), one of those under contract, had a frontage of 112.14 feet on Orange Place, running parallel to East Front Street.

Three of the foregoing 7 contracts, covering 4 adjoining parcels on the foregoing corner, were extended, two such extensions running to May 20, 1951, and the third to June 17, 1951. A further extension of each was made, two running to August 17, 1951, and the third to September 15, 1951.[2]

At some undisclosed time, petitioner was approached by a representative of a real estate firm in Newark (hereinafter called the firm), and was informed that R. H. Macy & Co., Inc. (hereinafter called Macy), was considering the land under option as part of a possible site for the construction of a store for its Bamberger division.

As a result of extensive negotiations, Blick and Macy entered into an agreement (hereinafter called the agreement) on May 9, 1951. Petitioner and his wife were designated as "Sellers" and Macy as "Purchaser." The agreement reads as follows:

### CONTRACT TO SELL

#### PLAINFIELD, NEW JERSEY

THIS AGREEMENT made this 9th day of May, 1951, between LOUIS D. BLICK and ANNA [sic] BLICK, residing in Elizabeth, New Jersey (hereinafter called the "Sellers") and R. H. MACY & CO., INC., a New York corporation doing business in the State of New Jersey through a division, L. Bamberger & Co., having its principal office in New Jersey at 131 Market Street, Newark 1, New Jersey (hereinafter called the "Purchaser").

#### WITNESSETH:

In consideration of the mutual covenants and agreements hereinafter set forth, the Sellers and the Purchaser hereby agree as follows:

1. The Sellers agree to sell and convey to the Purchaser and the Purchaser agrees to purchase all those lots, tracts, or parcels, of land and premises, together with all improvements now erected thereon, as particularly described in Schedule "A" attached hereto and made a part hereof, situate, lying and being in the City of Plainfield in the County of Union and State of New Jersey.

---

[2] On brief, respondent has argued that the original 3 contracts had expired prior to the time of any purported "extensions," that such "extensions" were new contracts, and that only 1, covering a single parcel, had been executed more than 6 months prior to the purported sale of options by petitioner. We note that the stipulation of facts herein states that these 3 options or contracts were "extended."

This conveyance includes all right, title and interest, if any, of the Sellers in and to any land lying in the bed of any street, road or avenue, open or proposed, in front of or adjoining said premises to the center line thereof, and all right, title and interest, if any, of the Sellers, in and to any award in any condemnation, damage or similar proceedings for the taking of any part of said premises, change of grade of any street, or other similar matter. The Sellers will execute and deliver to the Purchaser on the closing of title, or thereafter, on demand all proper instruments for the assignment to the Purchaser of any such award.

This sale includes all personal property which is acquired by the Sellers in connection with the acquisition of title to any portion of said premises by the Sellers.

2. The purchase price is EIGHT HUNDRED FIFTY THOUSAND DOLLARS ($850,000.00), payable as follows:

EIGHTY FIVE THOUSAND DOLLARS ($85,000.), promptly after the Sellers shall deliver to the Purchaser valid and binding agreements for the acquisition of title to all of the property necessary for the Sellers to convey the premises to be conveyed to the Purchaser hereunder, at a net cost to the Sellers not to exceed $850,000.00; provided, however, that the Sellers must apply the down payment towards the purchase of such property to the extent necessary so that the balance due under such agreements in the aggregate shall not exceed $765,000.00.

SEVEN HUNDRED SIXTY FIVE THOUSAND DOLLARS ($765,000.) at the closing of title and delivery of deed, in cash or by certified check.

3. The conveyance shall be by warranty deed (except for the church parcel which shall be bargain and sale) with full covenants, duly executed at the Sellers' sole expense, in proper form for recording so as to convey to the Purchaser a good and marketable record title to the land and improvements affected by this contract of sale free and clear of all liens, encumbrances, leases, restrictions and conditions, excepting the presently existing month-to-month tenancies with respect to the houses located on certain portions of the premises and excepting a lease to be entered into between the Sellers and THE FIRST PRESBYTERIAN CHURCH OF PLAINFIELD, NEW JERSEY which shall grant to said church the right to occupy the premises described in the agreement dated November 3, 1949, between Louis D. Blick and said church for religious purposes for a period of one (1) year from the date of the acquisition of title to such premises by the Sellers (but in no event for a period extending beyond August 1, 1952) at a rental of One ($1.00) Dollar but with the church obligated to assume all expenses in connection with such property during such period, including, without limitation, any real estate taxes. The Seller shall furnish to the Purchaser at the closing a certified statement showing the arrangements with respect to any such month-to-month tenancies. The closing of title shall be conditional upon delivery of good and marketable title and the issuance of a title insurance policy to such effect reasonably satisfactory to the Purchaser, by New Jersey Realty Title Insurance Company. It is understood that title to the real property 's not derived by or through operation of what is known as the "Martin Act", or tax title, or by adverse possession.

4. If, at the time of delivery of the deed, the premises or any part thereof shall be or shall have been affected by an assessment or assessments which are or may become payable in installments, of which the first installment is then a charge or lien, or has been paid, then for the purposes of this contract all the unpaid installments of any such assessment, including those which are to become due and payable after delivery of the deed, shall be deemed to be due and pay-

able and to be liens upon the premises affected thereby and shall be paid and discharged by the Sellers, upon the delivery of the deed.

5. The following are to be apportioned and adjusted as of the closing date:

a. Rents as, if, and when collected;

b. Water rents; and

c. Real estate taxes.

6. The closing of title, including delivery of the deed, with the necessary documentary stamps thereto attached, shall take place at the Executive Offices of L. Bamberger & Co., at 131 Market Street, Newark, New Jersey on August 1, 1951 at 10:00 o'clock in the forenoon of such date, or at such other time and place as may be agreed upon by the parties hereto.

7. The risk of loss or damage by fire or other casualty or cause to said premises before delivery of the deed is hereby assumed by the Sellers. In the event of such loss or damage, this agreement shall not be affected but the Sellers shall assign to the Purchaser all their rights under any insurance policies applicable with respect to any such loss or damage, or if the Purchaser shall so request, the Sellers shall permit the Purchaser to recover in the Sellers' names, but at the Purchaser's own expense, the amount of such loss upon such policies, or if the Sellers sue in their own names to recover the amount of such loss or damage they shall assign the amount so recovered to the Purchaser less expenses of recovery.

8. The Sellers warrant that Louis D. Blick has entered into the following contracts for the purchase of the premises described therein with the parties who are the present owners thereof respectively, all of which premises are located in Tax Block No. 109, in the City of Plainfield, New Jersey:

| Tax Lot No. | Date | Present Owner | Street Address |
|---|---|---|---|
| 5 | Sept. 20, 1949 | Louis Fusco and Mary F. Fusco___ | 29 Elm Place. |
| 6 | Sept. 30, 1949 | Harold J. Gardner and Katherine V. Gardner, his wife. | 27 Elm Place. |
| 7 | Sept. 20, 1949 | Louis Fusco and Mary F. Fusco, husband and wife. | 23-25 Elm Place. |
| 8 | Sept. 7, 1949 | Carko Realty Co_____ | 19-21 Elm Place. |
| 9 | Feb. 1, 1949 | Julian P. Linke and Elsie S. Linke, his wife. | 13-17 Elm Place. |
| 10 | Feb. 1, 1949 | Fred Ashley and Anna Ashley, his wife. | 251-253 East Front Street. |
| 11 | Nov. 19, 1948 | Howard V. Rowe and Margaret E. Rowe, his wife. | 247-249 East Front Street. |
| 12 | Feb. 1, 1949 | Julian P. Linke and Elsie S. Linke, his wife. | 243-245 East Front Street. |
| 13 | Nov. 3, 1949 | First Presbyterian Church of Plainfield, N.J. | 235-241 East Front Street. |

An original of each such contract has been initialed by the parties hereto for identification.

The Sellers warrant that each of said agreements has been modified in writing or verbal assurance given to the effect that said Louis D. Blick has the right to purchase the premises described therein on a date subsequent to the date hereof. Written modification of the agreements relating to Tax Lots No. 13, 12, 11, 10 and 9 have been initialed by the parties hereto for identification. The Sellers shall promptly obtain written modifications of the other agreements so extending the time to close and furnish the same to the Purchaser.

The Sellers hereby assign and transfer to the Purchaser all of the rights and interest of the Sellers under all of said purchase agreements; provided, how-

ever, that the Sellers shall have the right and are obligated hereunder to purchase the premises described in said purchase agreements in accordance with the terms thereof in order to comply with the provisions of this agreement. The Sellers shall have the right to extend the date of closing under any such purchase agreement to a date not later than August 1, 1951, to reduce the purchase price, or to permit removal of personal property, attached or unattached. The Sellers shall furnish the Purchaser with information and assurances satisfactory to its attorneys that there will be no default on the part of the Sellers under any of said purchase agreements, such information and assurances to be furnished at least five (5) days prior to the time any action on the part of the Sellers is required under any such purchase agreement. If the Purchaser shall purchase any of the premises described in any of said purchase agreements there shall be deducted from the purchase price payable hereunder the amount paid by the Purchaser plus all reasonable expenses in connection with such transaction including attorneys fees.

9. The Sellers warrant that the premises are zoned so as to permit their use by the Purchaser for the operation of a department store which may cover at least 85% of the premises to be conveyed with adjacent parking facilities.

10. All sums paid on account of this contract, and the reasonable expenses of the examination of the title to said premises are hereby made liens thereof, but such liens shall not continue after default by the Purchaser under this contract.

11. Time of performance under this contract is of the essence.

12. The Purchaser represents that it has not dealt or negotiated with any broker or brokers other than Feist & Feist with respect to the purchase of the property to be purchased hereunder. The commission payable to said brokers in connection with the sale of such property shall be paid by the Sellers.

13. The covenants and agreements herein contained shall inure to the benefit of and be binding upon the parties named herein and their respective heirs, executors, administrators, successors and assigns. This contract may be assigned by the Purchaser.

14. The covenants, terms and provisions of paragraphs 1, 3, 4, 7, 8 and 9 of this contract of sale shall survive the closing of title and delivery of the deed hereunder.

IN WITNESS WHEREOF, the Sellers have signed and sealed this contract of sale and the Purchaser has caused this contract of sale to be executed on its behalf by its duly authorized representative and its corporate seal to be affixed hereto by like authority, all the day and year first above written.

Schedule A, referred to in the agreement, reads as follows:

SCHEDULE "A"

to Contract of Sale dated May 9, 1951 between Louis D. Blick and Anna [sic] Blick, his wife and R. H. Macy & Co., Inc.

All of those lots, tracts or parcels, of land situate, lying and being in Tax Block No. 109 in the City of Plainfield, County of Union, State of New Jersey, as follows:

All of the premises bounded on the east by Elm Place, on the south by East Front Street, on the West by the westerly line of tax lot No. 13 and on the north by Orange Place, excepting only tax lot No. 3 and the northerly half of tax lot No. 2 which fronts on Orange Place and is contiguous with the westerly side of tax lot No. 3;

Being all of tax lots Nos. 13, 12, 11, 10, 9, 8, 7, 6, 5, 4 and the southerly half of Lot No. 2, being that portion thereof contiguous with the westerly line of tax lot No. 4;

The tax block and lots hereinabove referred to being as shown on map dated September 12, 1949 showing property in the City of Plainfield, made for Louis D. Blick by Edward S. Lewis T/A F. A. Dunham Co., Professional Engineers and Surveyors.

Lot Nos. 9, 10, 11, and 12 were those covered by the 3 contracts extended as previously described. The remaining lots with the exception of lot Nos. 2 and 4 had been subject to the other 4 earlier contracts.

Thereafter, and between May 11 and 24, 1951, new contracts in the form of agreements to purchase and sell real property, naming petitioner as purchaser, were entered into between petitioner and the owners of lot Nos. 2, 4, 5, 6, 7, 8, and 13. Petitioner's liability for nonperformance was in each case limited to forfeiture of the deposit paid. Each agreement except those covering lot Nos. 4 and 6 described petitioner as agent for an undisclosed principal. The contract with respect to lot No. 13, owned by the church, was assigned to Macy on August 1, 1951, by written assignment.

The deposit or downpayment on each contract was relatively nominal, except that payable to the church, which was in the amount of $27,500. On or about May 23, 1951, petitioner received a cashier's check from Macy in that amount, naming the church as payee. He delivered this check to the church as the required downpayment.

Closing of title took place on August 1, 1951. Macy purchased and received a deed to each lot directly from the named grantor.[3] Petitioner or his attorney notified the various grantors of the time and place of closing.

Each grantor received from Macy the balance of the purchase price specified in each respective agreement. Prior to the closing, petitioner had received $57,500 from Macy. He received the additional amount of $88,100 at the closing and a further amount of $2,250 thereafter.[4] He incurred various expenses, including the payment of a commission to the firm in the amount of $42,500, and enjoyed a net gain in the amount of $85,362.89.

On or about May 9, 1951, when petitioner received the payment of $57,500 from Macy, he delivered to Macy all of his contracts with the owners of the various parcels.

No part of the net gain realized by petitioner was in consideration of the sale, assignment, or other transfer of options or contracts.

---

[3] It appears that two deeds were delivered later, including one delivered at another closing on September 10, 1951. These variations have no bearing on the controversy herein, however, and for that reason have not been discussed at length.

[4] There is no explanation of a $50 discrepancy between $147,850, the total of the above figures, and $147,800, the figure spoken of elsewhere in the record as the total amount received by petitioner.

OPINION.

The only "property" held by petitioner for at least 6 months consists of 1 or more of the 3 contracts covering parcels 9, 10, 11, and 12. Petitioner contends that he sold to Macy agreements with the owners of the various tracts, that the 3 aforementioned contracts had been held by him for periods in excess of 6 months, and that all gain is allocable to the sale of those 3 contracts. We do not agree.

The written "Contract To Sell" dated May 9, 1951, is undeniably one to sell land, and even petitioner concedes on brief that this "is the most reasonable interpretation" thereof. Clause after clause is inconsistent with and goes far beyond a mere assignment of options. For example:

(1) Blick expressly agreed to sell and Macy to buy the "lots, tracts, or parcels, of land and premises."

(2) The agreement refers to and includes as property to be conveyed to Macy, all interest of Blick in, *inter alia*, any condemnation or similar award.

(3) Recognizing obliquely that Blick did not actually then hold title to the premises, the agreement is made to cover "all personal property" acquired by Blick "in connection with the acquisition of title to any portion of said premises."

(4) Macy has the right to require Blick to furnish warranty deeds to all parcels except as to that of the church.

(5) A short-term lease covering one parcel is anticipated between Blick as lessor and the church as lessee.

(6) Blick is required to satisfy any unpaid assessments.

(7) Rents, water rents, and real estate taxes are to be apportioned.

(8) A time and place is set for closing of title "or at such other time and place as may be agreed upon by [Blick and Macy]."

(9) Risk of casualty loss is on Blick.

(10) The existing and anticipated agreements between Blick and the owners of the various parcels are recited not as options, but as "contracts for the purchase of the premises."

(11) The same sentence in which Blick purports to "hereby assign and transfer" to Macy his rights under the various "purchase agreements" provides further that "the Sellers shall have the right and are obligated hereunder to purchase the premises described in said purchase agreements * * * in order to comply with" the agreement.

(12) Blick warrants the zoning of the tracts.

(13) Payments by Macy on the contract and expenses of title search are declared to be liens on the premises.

(14) Blick is required to pay the commission due on "the sale of such property [the real estate]."

(15) Blick's warrants and covenants are to survive closing of title.

Petitioner insists that the agreement was contrary to the intent of the parties, and that there was, further, a variation between its literal terms and performance. While some variations occurred, we are not convinced that the agreement failed to embody the actual intentions of the parties, or that any variation took place whereby petitioner received any amount as consideration for the assignment of options or contracts to purchase. The transaction in question having been the subject of a written contract, we would require clear and compelling evidence to ignore the terms of that contract to the extent urged by petitioner. Such evidence is not present here.

The only formal assignment of any of Blick's contracts or options was of that covering lot No. 13. It required a deposit larger than could be readily made by petitioner, and was probably so assigned because Macy furnished the funds therefor. That contract was held for less than 6 months, and the clause in the agreement with respect to assignment of Blick's contracts represented further security for Macy. It does not change the nature of the transaction, and was not the bargained-for exchange for which Blick received the payment in controversy.

Petitioner states on brief that the agreement was signed after "months of negotiations." This would strongly indicate that it did embrace the transaction actually intended. It is not reasonable that either petitioner or Macy would, after long negotiation, sign an agreement foreign to their understanding.

Petitioner further seeks to avoid the effect of the agreement by terming it a means of further security for Macy against actual taking of title by petitioner, despite the alleged assignment of his rights. This argument proves too much. If Macy insisted upon an instrument giving it the rights of a vendee and putting petitioner under the duties of a vendor, it would seem that the parties intended the very juridical relationship they created.

Moreover, petitioner's professed analysis of Macy's concern is without legal basis. If Blick as optionee has a right to specific performance against his optionors, Macy, as Blick's assignee, would have the same right not merely against those optionors, but also against petitioner as a purchaser with notice. Cf. *Clusman* v. *Wall-Murray Corporation*, 133 N. J. Eq. 353, 32 A. 2d 186.

Our conclusion is based upon the entire record, but a few matters merit specific attention.

Petitioner paid the firm a commission in the amount of $42,500, exactly 5 per cent of the amount of $850,000 set forth in the agreement as the purchase price of all the tracts. Petitioner's assurance on brief that this relationship of the two figures is mere coincidence is

not convincing, and contradicts parts of Blick's own testimony indicating that the payment to the firm was computed as 5 per cent of $850,000.

As noted by petitioner, any other figure would also be a percentage of $850,000. But "any other figure" would not bear a relationship thereto so strongly suggestive of a commission based upon a selling price of $850,000.

Petitioner also asserts, but only on brief, that real estate commissions "generally are at least 10%," and are in any event reached by individual negotiation, not by predetermined standard or formula.

But 5 per cent is not on its face unreasonably low. Although petitioner is himself a real estate broker, and called as his witness another expert in that field, he has introduced no evidence to support his assertion that such is the case locally. And while individual negotiation may determine the commission payable, it would seem ordinary and reasonable for the parties to agree to some fraction or percentage of the selling price. Moreover, paragraph 12 of the agreement expressly requires petitioner to pay the commission payable in connection with the sale of "such property," i. e., the land.

In view of petitioner's interpretation of this entire transaction, it is difficult to understand his insistence on brief that the proper base for a percentage commission would not be $147,800, the price allegedly received for the contracts, but "would more logically be based on the total purchase price paid by Macy's for the lands covered by Blick's options." We cannot perceive why, in the normal course, petitioner should pay a commission based not on the price realized by him on his sale, but based rather on that received by others for property sold by them; or more accurately based on the total amount paid out by Macy, for if Blick sold options, $850,000 would not be the "price paid by Macy's for the lands." That price would be slightly more than $700,000, i. e., $850,000 less the amount ($147,800) received by Blick.

Finally, in many instances 5 per cent of the sale price of the property ultimately transferred will exceed even the total reasonable value of options or contracts to purchase such property. If petitioner had truly sold such rights the only realistic basis for a commission payable by him, absent facts not here apparent, would be the price of what he sells, i. e., those rights. The price of something sold by others would be irrelevant. Here the commission paid was over 28 per cent of the purported sale price of Blick's contracts, a percentage bearing no discernable commission-like relation to such price, and higher than we believe petitioner could be persuaded to pay.

There is a conflict in the record as to the source of notice to the various grantors of the time and place of closing. Petitioner denied that he or his attorney gave such notice, but a letter produced in court written by his counsel to counsel for one of the grantors indicates the

620

contrary. A representative of Macy testified that Macy's files contained no record thereof, and that such absence would be strange and unusual if notice had been given by it or on its behalf. Weighing all the evidence, we are satisfied that either Blick or his attorney gave such notice, and we so find it as a fact.[5]

In *H. G. Butler*, 43 B. T. A. 1005, taxpayer received from *C* a 5-year lease with a coextensive option to purchase the leased property for $5,000. Thereafter, for $1,000, he gave *B* a 90-day option thereon to purchase fee title to the leased property for $36,000, the $1,000 being subject to retention by taxpayer as liquidated damages if the optionee did not purchase the property. *B* exercised his option, delivering to a bank his check for the balance due in the amount of $35,000. Taxpayer then exercised his option, paid *C* $5,000, caused *C* to convey to *B*, and received the check for $35,000.

The then Board of Tax Appeals held taxpayer to be, taxwise, in the position of a seller of the property under lease, notwithstanding a direct conveyance by *C* to *B*, which was deemed a mere convenience or economy of effort and expense. The terms of the actual document executed by taxpayer and *B* were held to control. While it recited taxpayer's lease and option, the ultimate transaction anticipated therein was the sale of land, not of an option.

In *Barber* v. *United States*, 215 F. 2d 663 (C. A. 8), certiorari denied 348 U. S. 897, taxpayers received an option from *N* Co. running to November 30, 1946, to purchase certain land for $150,000. They gave to *O* Co. an option running to November 20 to purchase the same land for $200,000. *O* Co. notified taxpayers of its intent to exercise its option, and they in turn notified *N* Co. of intent to exercise theirs, naming *O* Co. as purchaser in their stead. The deed was placed in escrow, and delivered to *O* Co. on payment to the escrow holder of checks in the amounts of $150,000 and $50,000, payable, respectively, to *N* Co. and petitioners.

The Court of Appeals held that taxpayers had sold land rather than an option, and that the direct payment and conveyance as between *N* Co. and *O* Co. was merely the most convenient and economical means of consummating the transaction. The court said, *inter alia*, at page 665:

Among the probative elements relied upon by the trial court in reaching its conclusion were the facts that the option from the taxpayers granted, without any ambiguity, the right to Oliver Iron Mining Co. "to purchase for the sum of

[5] Petitioner notes in his reply brief that a member of the firm of attorneys then representing him was present at this hearing in response to a subpoena served by respondent. He seems to find in respondent's failure to call this witness to the stand justification for an inference favorable to his (petitioner's) position on this question. But the witness was equally available to petitioner, who bears the burden of proof, and may not so easily shift this burden to respondent. It would seem to be more incumbent on petitioner to call his own former counsel. We do not choose to draw any inference from the failure of both parties to elicit information from the attorney on this point. If we were compelled to do so, however, it would be to the disadvantage of petitioner rather than respondent.

Two Hundred Thousand Dollars ($200,000) the following described lands;" that in connection with the right granted to purchase the land the instrument referred to the taxpayers as "Sellers"; that it contained no mention of the existence of the taxpayers' option right, nor did it in any other demonstrable manner purport to relate the obligation, which would become fixed against the taxpayers upon an exercise by Oliver Iron Mining Co. of its option, to the questions of whether the taxpayers held an option right or how that option right was to be exercised; that the option given by the taxpayers required them to deliver to Oliver Iron Mining Co. "a warranty deed conveying good title," as a matter of absolute obligation on their part, regardless of what right they might or might not have in the land itself, and so necessarily had the effect of constituting the sale to Oliver Iron Mining Co. as one of the property itself and not of the taxpayers' mere option right; that the taxpayers themselves had further given confirmation to the lack of any created legal relationship between their own option right and the right existing in favor of Oliver Iron Mining Co. by their act of making exercise of their option on the basis of their own prerogative right to do so, without having Oliver Iron Mining Co. join in any way as a party thereto, so that the situation stood legally as one of contractual obligation for purchase price and conveyance between the taxpayers and Niles Land Co. only, with the taxpayers thus being left in a position to claim breach and damages for any failure of Niles Land Co. to make conveyance to Oliver Iron Mining Co. as their nominee; and also that the taxpayers had joined with Niles Land Co. in setting up an escrow arrangement, which served the purpose not merely of insuring that they would conveniently get their $50,000 profit, but also of facilitatingly effecting a concurrent discharge of the obligations which they had incurred both to Niles Land Co. and to Oliver Iron Mining Co., and at the same time too, of course, of enabling them to save the expense of revenue stamps for a separate, direct conveyance.

The question as to whether or not petitioner sold options as he claims is essentially one of fact. Nonetheless, the *Butler* and *Barber* cases are sufficiently close on their facts to be helpful. We think them so similar in relevant details that a contrary result here would be inconsistent with their rationale.

Each of those cases differs in certain precise factual elements from that now before us. Yet for the most part, where one does so differ, the other does not. For example: In *Butler* taxpayer paid his optionor, but in *Barber* as in the instant case such payment was directly by the ultimate purchaser. In *Barber* the taxpayers gave a quitclaim deed, but this was not true in *Butler*, nor in this case. The contract in *Barber* did not cite taxpayer's existing option rights, but such reference was made in *Butler* as in the case at bar.

Certain other purported distinctions are nonexistent. Thus, petitioner states that in *Barber* "the intention * * * was to sell land, while in this case [it] * * * was to sell options." Our findings of fact are to the contrary. The fact is alluded to that in *Barber* the taxpayers referred to *O* Co. as their nominee, whereas here Macy was not "merely" so designated. But Macy was not referred to at all, let alone not "merely" as a nominee. Until closing, as far as the record shows, all dealings between petitioner and the owners of the various parcels proceeded as though Macy did not exist.

Some of the contracts contain the declaration that Blick is acting as agent for an undisclosed principal. If anything, such declaration is inconsistent with petitioner's theory that he sold options which he owned in his own right. In any event, such assertions are absent from those options arguably held for at least 6 months, and petitioner vigorously denies that any part of his gain is attributable to any of the options containing that statement.

Petitioner notes the presence in both *Butler* and *Barber* of noncoextensive options. That fact militated against the taxpayers in each of those cases, but the converse is not necessarily true. A mere absence of two noncoextensive options is not proof of an assignment or sale of options.

Moreover, the rights held by petitioner are not coextensive in time with those granted Macy in the agreement. The closing date set forth in the agreement is August 1, 1951. On the date the agreement was executed 2 of the 3 contracts allegedly responsible for all of petitioner's profit were to expire in May, and the other in June.

If in view of Macy's right to refuse to accept less than all parcels the agreement be deemed an option in its favor, it is clearly noncoextensive with all of those contracts held by Blick and conceivably productive of capital gain. If not an option, but rather a fully bilateral contract, we hold that it is for the purchase and sale of land and not of options.

Finally, as the "essential factor" differentiating the cases, petitioner argues that here he never exercised his supposed options. This ignores the actual nature of petitioner's rights.

Petitioner had more than "pure" options, which merely confer a right to bind the owner to sell by a further juridical act of exercise or notice. The documents here without further ado so bound the owners, who would thereupon be *released* only if petitioner thereafter failed to tender his performance.

Thus, while under local law the documents are designated as "options" (cf. *Sooy* v. *Henkelman*, 104 N. J. Law 540, 142 Atl. 17) the actual rights and liabilities as between petitioner and the owners differ from those found in the usual optionor-optionee relationship. The actual relationship here was of a hybrid nature, and more favorable to petitioner. Petitioner's rights were essentially those of the typical optionee *after* exercise, where the optionor is fully bound to sell (but the optionee is also bound to buy). His liabilities, however, were more like those of an optionee prior to exercise of an option, since he was not bound beyond the deposits paid.

Hence, there was nothing further to be done by petitioner which would amount to an "exercise," except notify the optionors of the time and place of closing, which we have found as a fact he did, and to appear at the closing ready to perform either individually or

through his nominee. He already possessed the rights which the taxpayers in *Butler* and *Barber* acquired only by further formal exercise of their options.[6]

The so-called "essential factor" distinguishing the cases is thus illusory. It arises from the error of assuming that because the word "option" is used to describe two instruments, the relationships created by each are necessarily identical in all details.

Our disposition of the principal issue makes moot questions of allocation of gain and the holding period of 2 of the options involved. We note, however, that were we convinced that petitioner had sold options, we could not find in the record any basis for allocating the total gain realized or for allocating a part or all of said gain to Blick's services as Macy's agent as to those acquisitions where agency was claimed.

We are not convinced that all gain is attributable to the contracts covering lot Nos. 9, 10, 11, and 12. Accordingly, the same ultimate result would follow, for even apart from the question of allocating an amount as compensation for services, "a lump sum purchase price is not to be rationalized after the event of sale as representing a combination of factors which might have been separately stated in the contract if the parties had seen fit to do so." *O. N. Bymaster*, 20 T. C. 649, 653–654.

Respondent's determination of a deficiency must be sustained.

*Decision will be entered for the respondent.*

---

[6] "An option to sell without any obligation to purchase is enforceable in equity against the optionor, if made upon proper consideration [citations omitted] * * *." *Hildinger v. Bishop*, 126 N. J. Eq. 334, 8 A. 2d 813, 817.