Charles W. Moore and Genevieve Moore v. Commissioner.
Moore v. Commissioner
Docket No. 5522-66.
United States Tax Court
T.C. Memo 1968-266; 1968 Tax Ct. Memo LEXIS 29; 27 T.C.M. (CCH) 1433; T.C.M. (RIA) 68266; November 25, 1968. Filed *29 George K. Folsom, 16th Floor, First Nat'l Bank Bldg., 1 E. First St., Reno, Nev., for the petitioner. Eugene H. Ciranni and Joseph Nadel, for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: Respondent determined a deficiency in petitioners' income tax for 1961 in the amount of $64,543.74, as well as an addition to tax under section 6653(a) of the Internal Revenue Code of 1954, [1] in the amount of $3,227.19. [2]
As a result of concessions by both parties, the only issue remaining for our determination is whether petitioner received, as part of the consideration for the sale of his stock in 1961, an option to purchase ranch properties. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners were husband and wife during 1961, the tax year in question. They became divorced on November 30, 1964, and as of the time *30 the petition was filed in this case, September 28, 1966, the legal residence of petitioner Charles W. Moore was Carson City, Nevada, and the legal residence of petitioner Genevieve Moore was San Diego, California. Petitioners filed a joint income tax return for the calendar year 1961 with the district director of internal revenue at Reno, Nevada. Inasmuch as Genevieve Moore is joined here only by virtur of such joint return, the term "petitioner" will hereinafter be used with respect to Charles W. Moore. Petitioner has been a real estate broker and rancher during most of his adult life. His real estate activities have included operating a sole proprietorship real estate business in Reno, Nevada, for many years. On petitioner's tax return for 1961, he listed his occupation as that of a realtor 1434 and for the years 1960 through 1962 he reported gross receipts and net income from the operation of his real estate business as follows: Year
Gross receipts
Net income (loss)
1960
$94,606.06
$63,234.71
1961
11,360.15
(26,082.75)
1962
30,475.30
13,921.31 During the summer of 1958, petitioners were in the process of obtaining a divorce. In order to obtain *31 funds to finance a cash settlement with his wife, as well as to meet other financial needs, petitioner arranged for a loan in the amount of $100,000 with the First National Bank of Nevada (hereinafter referred to as First National). Since First National required a guarantor for the loan, petitioner made an arrangement with David C. Bintliff (hereinafter referred to as Bintliff), which was evidenced by an agreement dated July 17, 1958 (hereinafter sometimes referred to as the July agreement), and was entered into by petitioner and Jack G. Taylor (hereinafter referred to as Taylor), [3] whereby Bintliff agreed to guarantee petitioner's loan provided petitioner would secure Bintliff against loss in the event petitioner failed to repay his loan when due. Petitioner's security consisted of his executing and delivering to Bintliff's attorney deeds covering petitioner's interest in two ranches, the Big Springs Land and Cattle Company Ranch (hereinafter referred to as the Big Springs Ranch) and the Sierra Gables Guest Ranch (hereinafter referred to as the Sierra Ranch), together with bills of sale covering petitioner's interest in all personal property appurtenant to those ranches. As further *32 security for Bintliff's guarantee, petitioner was to assign and deliver to the Commercial Mortgage Company (hereinafter referred to as Commercial) certain of his life insurance policies as well as an assignment of his future real estate commissions, one-half of which commissions was to be applied in reduction of the bank loan with First National and the other half to be remitted to petitioner provided he did not default on his loan payments. The July agreement further provided that as soon as possible after its execution, petitioner and Taylor would form a Nevada corporation to be known as the Big Springs Land and Cattle Company (hereinafter referred to as the Corporation) and issue 51 percent of the corporate stock to Taylor and the remaining 49 percent to petitioner. [4] The Corporation was then to purchase all of the real and personal property of the Big Springs Ranch. Upon such purchase and as additional security for Bintliff's guarantee, petitioner was to place in escrow with First National his 49 percent stock interest in the *33 Corporation as well as execute and deliver to Commercial a deed of trust on two other parcels of real property. Upon the transfer of those two parcels to Commercial, Bintliff's attorney was to retransfer to petitioner title to the Sierra Ranch provided petitioner first deposit $35,000 with the trust department of First National. The agreement then provided that if the Corporation acquired title to the Big Springs Ranch, petitioner and Taylor would each lend the Corporation $55,000 which was to be deposited in the Corporation's bank account. [5] The agreement finally provided that the proceeds of petitioner's $100,000 loan were to be deposited in escrow with First National's trust department which, in turn, was to disburse the moneys as follows: $55,000 for the objective of enabling petitioner to effectuate a property settlement with his wife; [6] $20,000 in partial fulfillment of petitioner's obligation to lend the Corporation $55,000; and the balance, or $25,000, to be delivered to petitioner. [7]
*34 On December 5, 1958, petitioner delivered to First National, pursuant to the July 1435 agreement, his stock in the Corporation, together with escrow instructions. On January 15, 1960, petitioner delivered to First National an amendment to the escrow instructions which provided that effective June 15, 1960, and for a period of 30 days thereafter, Bintliff was granted the option to purchase 3,838 shares of petitioner's stock, or approximately 15.7 percent of the issued stock of the Corporation, at a price of $1 per share, provided the Big Springs Ranch was not sold by a determinable date. On June 15, 1960, Bintliff exercised the option and acquired an additional 3,838 shares, leaving petitioner with only 8,167 shares, or a one-third interest in the Corporation. Immediately after its organization, the Corporation acquired the Big Springs Ranch pursuant to the July agreement. This ranch was used primarily for cattle grazing and cattle raising. The ranch consisted of approximately 550,000 acres, being 118,000 deeded acres, more or less, 60,000 to 70,000 of railroad leased land, and the balance, Taylor grazing land. The ranch headquarters was located near the center of the property *35 at Oasis, Nevada. Two additional ranches, one known as the Smiley Brothers Ranch and the other known as the Wes Helth or Quarter Circle J Ranch, and together known as the Starr Valley Ranches, were respectively obtained by the Corporation in September 1959 and July 1960. The Starr Valley Ranches consisted of approximately 40,000 acres with headquarters near Death, Nevada. The eastern extremity of those ranches is about 10 miles from the western boundary of the Big Springs Ranch. These three ranches constituted the principal properties owned by the Corporation during its entire existence. The operations of the Corporation were financially unsuccessful and it was necessary for the shareholders to advance funds to the Corporation to enable it to continue its operations. Due to financial limitations, petitioner was unable to advance funds to the Corporation in proportion to his stockholding interest. For that reason, it was necessary for Bintliff to arrange for virtually all of the Corporation's financing and as of December 1, 1960, he had personally loaned $471,392.60 to the Corporation and by May 1961, he had personally guaranteed additional financing for the Corporation in the amount *36 of $1,700,000. Prior to June 1961, petitioner was president of the Corporation and being its only officer and stockholder living in Nevada, he supervised the overall operation of the corporate properties in Nevada although the Corporation also employed a manager to handle the day-to-day running of the ranches. Neither petitioner nor the other stockholder-officers received any compensation for personal services rendered to the Corporation and the Corporation had no legal obligation to compensate any of its officers. Bintliff, in order to relieve himself of the financial pressures created by his debt position with the Corporation, notified petitioner on or about December 1, 1960, that he wanted petitioner to aggressively attempt to sell or refinance the corporate properties within the next 6 months. Bintliff's desire to protect himself with regard to his debt position also prompted him to require petitioner, on December 1, 1960, to execute a Pledge and Collateral Assignment of Stock (hereinafter referred to as the Assignment of Stock) with respect to petitioner's remaining one-third stock interest in the Corporation. The Assignment of Stock, after reciting that petitioner personally *37 guaranteed the repayment of one-third of the Corporation's existing and future debts to Bintliff, provided in part, that if the Corporation was unable to pay its indebtedness to Bintliff when called upon to do so and if petitioner was not able to immediately honor his guarantee to Bintliff, the trustee under the Assignment of Stock was authorized to sell petitioner's securities: in whole or in part, at public or private sale * * * to the highest bidder for cash, free and clear of all rights of redemption, marshalling of assets, or sale in inverse order of alienation, all of which are hereby expressly waived * * * During the 6-month period from December 1, 1960, to June 1, 1961, petitioner placed the Corporation's ranches for sale with several real estate brokers and continued attempts were made to either sell or refinance the ranch properties. During the spring of 1961, the ranch properties were shown by brokers to W. Russell Peavey and his wife Florence G. Peavey (hereinafter referred to as the Peaveys), at which time petitioner was introduced to the Peaveys as one of the owners of the ranches. About a month after their initial tour of the ranches, the Peaveys looked at the ranches *38 again and decided that while they were not interested in purchasing the Big Springs Ranch, they were interested in the Starr Valley Ranches. Petitioner and the Peaveys then began negotiations concerning the sale and purchase of the Starr Valley Ranches. 1436 On or about June 8, 1961, petitioner went to Houston, Texas, at Bintliff's request, to work out a plan for the orderly liquidation of the Corporation. As a result of discussions between petitioner and Bintliff during the period June 8 to 10 in Houston, it was agreed that petitioner would sell his one-third interest in the Corporation to Bintliff for $79,840.46, to be evidenced by two checks, one for $3,850.68, and the other for $75,989.78, the latter check to be endorsed over to First National in cancellation of petitioner's loan at that bank. On June 10, 1961, pursuant to their agreement, petitioner sold his stock to Bintliff who then issued two checks to petitioner. [8] The statement of account attached to each of these checks contained the following notation: "Consideration to C. W. Moore for purchase of his 8,167 shares of stock in Big Springs Land & Cattle Co.[9]
*39 Also on June 10, Bintliff wrote First National a letter which provided, in part, as follows: We are pleased to hand you herewith check of David C. Bintliff of even date in the sum of $75,989.78 payable to the order of C. W. Moore and endorsed by the said C. W. Moore to your order. You will note from the endorsement on the back of this check that it represents payment to Mr. Moore by Mr. Bintliff for the purchase of 8,167 shares of the capital stock of Big Springs Land and Cattle Company. * * * We are also enclosing herewith letter of authorization from Mr. Moore to you requesting that as soon as the above check has cleared your Bank that you forward direct to Mr. David C. Bintliff by insured registered mail the stock certificates for 8,167 shares of the capital stock of Big Springs Land and Cattle Company which have been purchased by Mr. Bintliff as set forth above and which you are now holding in the subject escrow pursuant to the instrument above described. As indicated by the above letter, the check for $75,989.78 was enclosed and properly endorsed to the bank. The bank applied the check as directed and on June 20, 1961, petitioner's loan was marked paid. At the time petitioner *40 sold his stock to Bintliff there was no agreement between them that part of the consideration given petitioner was for past services rendered by petitioner to the Corporation. The total consideration given to petitioner was in exchange for his one-third stock ownership in the Corporation. There was no discussion during the June negotiations between petitioner and Bintliff that petitioner was to receive an option to purchase the properties of the Corporation in exchange for his past services to the Corporation. Up to the time petitioner sold his one-third interest, he was president of the Corporation. Thereafter, and until the Corporation was liquidated, Taylor was president. At the time of the June negotiations in Houston, Bintliff knew that petitioner had talked to prospective purchasers regarding the sale of at least some of the Corporation's property and that petitioner felt reasonably sure he could make a sale. Although Bintliff was desirous of eliminating his potential financial obligations to the Corporation as soon as possible, he orally agreed, in his capacity as the Corporation's board chairman, to give petitioner 30 days in which to find a purchaser for the corporate properties. *41 [10] It was agreed that if petitioner found a willing buyer, the Corporation would sell the property to petitioner and he in turn would sell it to the buyer. This oral agreement did not exclude the possibility that a purchaser might be found within the 30-day period by another real estate agent but merely reflected Bintliff's willingness to personally refrain from actively attempting to advertise or sell the properties during that period. In addition, the agreement failed to mention a minimum sales price which would be acceptable to the Corporation, it being understood that the sales price on any of the corporate property would have to be approved by 1437 Bintliff and Taylor, the remaining share-holders of the Corporation. *42 Between June 10 and 15, 1961, following petitioner's meeting with Bintliff in Houston, petitioner again met with the Peaveys and agreed on terms by which the Peaveys were to purchase the Starr Valley Ranches for $500,000. Then, on or before Juen 15, 1961, following his meeting with the Peaveys, petitioner, who was in San Diego, phoned Bintliff, who was in Boise, Idaho, in order to get his approval on a sale price for the Starr Valley Ranches. Bintliff, when asked by petitioner what price he would accept, replied that his "offer" was $325,000. Following this phone conversation, Bintliff, with Taylor's approval, sent petitioner a telegram dated June 15, 1961, which read as follows: Agreeable opening sales escrow with minimum $30,000 (Thirty Thousand Dollars) good faith deposit on Starr Valley Ranches, Elko County, Nevada, with Pioneer Title Company, Reno, on basis that seller [Corporation] will accept $325,000 (three hundred and twenty-five thousand dollars) net cash to seller for the equities, subject to existing contracts and encumbrances of record. Sales price is to include 535 (five hundred and thirty-five) cows branded quarter circle J and their calves, 19 (nineteen) bulls *43 same brand. Only inventories of equipment and personal property acquired from Smiley and Helth to be included and agreed upon in escrow between buyer and seller. Sale subject to all usual and customary prorations between buyer and seller. No commission shall be paid by seller. This offer subject to receipt of telegraphic approval and acceptance by June 16, 1961, or offer shall be withdrawn. Closing must take place no later than July 1, 1961 David C. Bintliff. On the same day petitioner sent Bintliff a return telegram which stated that: YOUR OFFER TO SELL STARR VALLEY RANCHES AND CATTLE AS OUTLINED IN YOUR WIRE TO ME IS APPROVED AND ACCEPTED WILL PROCEED WITH SALES ESCROW REGARDS C W CHUCK MOORE. Because of the geographical distance separating petitioner and Bintliff, petitioner had two concurrent and interdependent escrow accounts created. One escrow account was handled by the Pioneer Title Insurance Company of Nevada (hereinafter referred to as Pioneer) at its Elko, Nevada, office and the other was handled by the Union Title Insurance Company (hereinafter referred to as Union) at its San Diego office. The Pioneer escrow account was created to handle the purchase of the Starr *44 Valley Ranches by petitioner from the Corporation and the Union escrow account was created to handle petitioner's resale of those properties to the Peaveys. On June 16, 1961, Pioneer received $30,000 from petitioner pursuant to petitioner's acceptance of Bintliff's telegraphic offer and on June 20, 1961, petitioner wrote Bintliff informing him that he had made the $30,000 escrow deposit with Pioneer. All the negotiations relating to the sale of the Starr Valley Ranches were discussed in terms of the price to be paid for the equity in those ranches, exclusive of encumbrances. Thus, petitioner paid $325,000 for the equity interest in the ranches and the Peaveys paid $500,000 for the same interest, each purchase being subject to an adjustment of $36,325 for a one-third interest in the cattle retained by petitioner. The encumbrances against the Starr Valley Ranches were assumed by petitioner upon his purchase of the ranches from the Corporation and those encumbrances were in turn assumed by the Peaveys when they purchased the ranches from petitioner. As a result of petitioner's purchase and immediate sale of the Starr Valley Ranches, he realized a net increase of $152,376, computed as *45 follows: Sale price: petitioner to Peaveys
$500,000.00
Less: value of 1/3 in- terest in cattle retained by petitioner 36,325.00
Net price to Peaveys
$463,675.00
Sale price: Corporation to petitioner
325,000.00
Less: value of 1/3 in- terest in cattle retained by petitioner 36,325.00
288,675.00
$175,000.00
Petitioner's expenses of sale: Elko escrow costs:
Recording
8.00
1/2 policy fee
1,144.00
1/2 escrow fee
346.25
San Diego escrow costs: Title insurance
200.00
Escrow fee
616.00
Drawing deed
5.00
Drawing bill of sale
5.00
Revenue stamps
295.35
Telegraph & tele- phone tolls
4.40
Brokerage commission paid by petitioner 20,000.00
22,624.00
Petitioner's net increase on transac- tion
$152,376.00 1438 The operations of the Corporation were never financially successful and it was liquidated, pursuant to section 333 of the Code, on January 31, 1962. No dividend payments were ever made to its shareholders prior to liquidation. The profits and losses reported by the Corporation during its entire existence, excluding net operating loss carryforwards, were as follows: Taxable period
Profit (loss)
Aug. 8, 1958 to Dec. 31,1958
$ (50,935.36)
1959
(6,309.70)
1960
(103,401.11)
1961
47,428.17
Jan. 1, 1962 to Jan. 31, 1962
31,562.21
*46 The profits reported by the Corporation in 1961 arose solely from the sale to petitioner of the Starr Valley Ranches and the profits reported for the month of January 1962 arose solely from the sale of the Corporation's cattle. At the time the Corporation was dissolved, it reported an unused net operating loss carryforward of $81,655.79. On its income tax return for 1961, the Corporation reported the sale of the Starr Valley Ranches but did not report the granting of an option to petitioner as part of the sales price. On his 1961 tax return, petitioner reported the gain from both the sale of his stock to Bintliff and the sale of the ranches to the Peaveys as long-term capital gain arising from the sale of "Stock - Big Springs Land & Cattle Co." In the notice of deficiency, respondent determined that although the sale of petitioner's stock resulted in a longterm capital gain, the sale of the ranches resulted in short-term capital gain, taxable at ordinary rates. Opinion On June 10, 1961, petitioner sold his 8,167 shares of stock to Bintliff for $79,840.46 in cash. Soon thereafter and pursuant to an arrangement agreed to between petitioner and Bintliff during their June negotiations *47 in Houston, petitioner purchased the Starr Valley Ranches from the Corporation and immediately resold them to the Peaveys. Petitioner's net increase upon resale to the Peaveys was $152,376. Petitioner contends that he received total consideration for his stock in the amount of $232,216.46, consisting of $79,840.46 in cash plus $152,376 which he claims was the fair market value of an option to purchase the Starr Valley Ranches, which option petitioner allegedly received as partial consideration for the sale of his stock to Bintliff. Since petitioner's basis in the stock sold to Bintliff was $8,167, he argues that the difference between that amount and $232,216.46 was taxable as long-term capital gain. Petitioner then contends that the value of the alleged option he received, or $152,376, should be added to his cost basis in the Starr Valley Ranches, resulting in his realizing no gain or loss on the sale of those properties to the Peaveys. Respondent, on the other hand, contends that the total consideration petitioner received for his stock was $79,840.46, and therefore the difference between petitioner's basis in his stock, $8,167, and the cash received on the sale of that stock, *48 $79,840.46, should be taxed as long-term capital gain. Respondent further contends that petitioner never received an option as partial consideration for his stock and therefore, when he simultaneously purchased and resold the Starr Valley Ranches, he realized a profit of $152,376, which was taxable as short-term capital gain. The threshold question is whether petitioner received, as partial consideration for the sale of his stock to Bintliff, an option to purchase any of the Corporation's properties. If he did not, his resale of the Starr Valley Ranches resulted in a short-term capital gain in the amount of $152,376, taxable as ordinary income. In order to determine this issue, it is necessary to consider the elements of an option. Black's Law Dictionary (4th ed. 1957), defines an option as: A continuing offer or contract by which owner stipulates with another that latter shall have right to buy property at fixed price within certain time, and an agreement is only an "option" when no obligation rests on party to make any payment except such as may be agreed on between parties as consideration to support option until he has made up his mind within time specified to complete purchase. *49 Since we have found that petitioner sold his stock to Bintliff on June 10, 1961, petitioner's alleged option must have been agreed to no later than that date although we recognize the possibility that it might not have been reduced to writing until a subsequent time. In this regard, petitioner contends that the option he allegedly received was documented by a telegram sent him by Bintliff on June 15, 1961, 5 days after the sale of his stock. The glaring weakness in petitioner's contention is that there appears to be virtually no evidence from which we can reasonably find that the telegram in question resulted 1439 from any agreement between petitioner and Bintliff on or before January 10, 1961. To the contrary, all of the documents surrounding the sale of petitioner's stock compel the opposite conclusion, namely, that the entire consideration received by petitioner was cash in the amount of $79,840.46. Thus, the two checks received by petitioner from Bintliff on June 10 were specifically receipted "Consideration to C. W. Moore for purchase of his 8,167 shares of stock in Big Springs Land & Cattle Co." The letter of instruction sent to First National by Bintliff, dated June 10, 1961, and *50 containing petitioner's check for $75,989.78, specifically stated that the enclosed check "represents payment to Mr. Moore by Mr. Bintliff for the purchase of 8,167 shares of the capital stock of Big Springs Land and Cattle Company." Petitioner signed this letter in the lower left hand corner under the word "Approved." Also of significance in this respect is the fact that Bintliff's books and records relating to the purchase of petitioner's stock reflected a cost basis equal only to the amount of the cash paid, $79,840.46, without any mention of an option to petitioner. A similar omission is found in the Corporation's 1961 tax return which, although reporting the sale of the ranches to petitioner, never mentioned an option to petitioner as part of the sales price. In viewing the foregoing facts in the context of the parties involved, we find it difficult to ascribe any sound reason for the total absence of any documentary evidence tending to substantiate petitioner's contention that he received an option as part of the consideration for his stock. While this record stands as a monument to the effort to which experienced businessmen will go in attempting to fully document their every *51 business move, yet, when we come to the most financially significant aspect surrounding the sale of petitioner's stock, an alleged option valued at more than $152,000, the record is silent. We think that this fact alone strongly compels the conclusion that petitioner received no option at the time of sale, and that his contention here is but an afterthought. On June 10, 1961, Bintliff knew that petitioner felt reasonably sure he could find a buyer for at least some of the corporate property. Although Bintliff was interested in selling this property as soon as possible in order to be relieved of certain financial obligations relating to the Corporation, he had no desire to hinder petitioner's chances of profit on the sale of those properties. In order to give petitioner, an experienced real estate salesman, a final chance to sell the ranches, Bintliff orally agreed to permit him an additional 30 days to find a buyer. However, no sales price was agreed upon for any of the ranches, it being understood that should petitioner find a buyer, the sales price would be subject to the approval of Bintliff and Taylor. Not only did this oral agreement fail to specify a fixed or determinable purchase *52 price, it also lacked another important aspect of an option, that being the right on the part of the option holder to bind the owner to sell within the time agreed upon. Louis D. Blick, 31 T.C. 611, 622 (1958), affd. 271 F. 2d 928 (C.A. 3, 1959). Bintliff merely promised petitioner that during the 30-day period he would refrain from actively attempting to advertise the properties for sale. We find no suggestion in that promise that petitioner was given an exclusive right to purchase any of the ranch properties. To the contrary, several other real estate agents were familiar with the availability of the ranches and had they gone to Bintliff with a willing purchaser prior to petitioner, we cannot say from the facts before us that Bintliff would have been prevented from consummating a sale with such a purchaser within the 30-day period. From the foregoing it appears that petitioner did not receive even an oral option as of June 10, 1961. Consistent with this view is the fact that the June 15 telegram from Bintliff, which petitioner contends is evidence of a 1-day option, was sent by Bintliff only after petitioner informed him by telephone that he had a purchaser *53 for the Starr Valley Ranches. Petitioner asked Bintliff what price was acceptable to him and only after Bintliff informed petitioner that the price for the equity interest was $325,000 net did he send petitioner the telegram. Under these circumstances, it is difficult to find that Bintliff's telegram constitute anything more than an offer and petitioner's reply telegram an acceptance. [11]
Petitioner's theory is further weakened by the fact that Bintliff had promised to refrain for 30 days from interfering with petitioner's attempt to sell the ranches. Yet, Bintliff's telegram to petitioner required an acceptance by the following day and settlement by July 1, 1961, both dates being less than the 30-day period originally promised 1440 by Bintliff on June 10. Thus, not only did the oral agreement of June 10 constitute something less than an option to purchase the corporate ranches, but the June 15 telegram relied upon *54 by petitioner was inconsistent with the terms of that agreement, thereby effectively foreclosing the possibility that Bintliff's telegram was in any way intended to constitute partial consideration to petitioner for the sale of his stock to Bintliff. In light of our conclusion, we must sustain respondent's contention and hold that the total consideration received by petitioner on the sale of his stock to Bintliff consisted of cash in the amount of $79,840.46, and that petitioner's subsequent purchase and sale of the Starr Valley Ranches resulted in a short-term capital gain in the amount of $152,376. Decision will be entered under Rule 50. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. ↩
2. Petitioners concede that the 5 percent addition to tax provided by section 6653(a)↩ is applicable to any deficiency determined by the Court.
3. Taylor was both an employee and associate of Bintliff and apparently entered the July agreement with petitioner in a representative capacity.↩
4. On September 3, 1958, the corporate stock was issued in the following amounts and percentages: petitioner - 12,005 shares, or 49 percent: Bintliff - 6,370 shares, or 26 percent; and Taylor - 6,125 shares, or 25 percent. ↩
5. It was provided in the agreement that as to petitioner's $55,000 loan to the Corporation. $35,000 was to be deposited by petitioner with the trust department of First National upon the retransfer to him of the Sierra Ranch. The remaining $20,000 due from petitioner was to be taken from his $100,000 loan from First National and held in escrow until it could be deposited in a bank account which was to be established for the Corporation. By the end of September 1958, petitioner had actually advanced $57,159.54 to the Corporation. ↩
6. This disbursement was conditioned upon petitioner's wife executing quitclaim deeds to petitioner covering all of her interest in any of the properties referred to in the agreement. ↩
7. By a letter dated July 21, 1958, and signed by petitioner and Taylor's attorney, First National was directed to disburse petitioner's $100,000 as follows: $57,661.98 to an escrow account (presumably to effectuate the property settlement between petitioner and his wife); $22,338.02 to petitioner; and $20,000 as partial payment of petitioner's loan to the Corporation.↩
8. Bintliff's books and records reflected his cost basis for the stock which he purchased from petitioner on June 10, 1961, as $79,840.46, the exact amount agreed upon. ↩
9. These 8,167 shares were acquired by petitioner upon the organization of the Corporation in 1958 for $8,167, the par value of that stock.↩
10. Bintliff's motives for granting petitioner this 30-day extension are not entirely clear but it appears from the record that Bintliff felt a moral obligation to reward petitioner for his past efforts on behalf of the Corporation. Thus, Bintliff, reflecting on the 30-day extension, testified that during the Houston meeting in June 1961, he considered petitioner a "poor devil" who "had worked diligently and vigorously to try to dispose of the properties" and Bintliff wanted to see petitioner "come out whole" and "realize substantially his portion of the company." Finally, Bintliff testified that "I did not want to hurt this man who tried so very hard to run this operation. He was president of the company on an acceptable basis, but it was not acceptable. We had been losing money, and I didn't want to go beyond that point."↩
11. Bintliff's own testimony characterized his agreement on a sales price of $325,000 as an "offer" to petitioner. In addition, both of the June 15 telegrams used the terms "offer" and "acceptance," there being no mention in either of the exercise of an option.↩