**William W. SAUNDERS and Gertrude H. Saunders, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. 2368.**

United States District Court
D. Hawaii.

Dec. 20, 1968.

Lewis, Saunders & Sharpless, by Dudley C. Lewis, Honolulu, Hawaii, for plaintiffs.

Mitchell Rogovin, Asst. Atty. Gen., Dept. of Justice, by Jerome Fink and W. Forbes Ramsey, Attys., Dept. of Justice, and Yoshimi Hayashi, U. S. Atty., Dist. of Hawaii, for defendant.

## DECISION

TAVARES, District Judge.

This is an action whereby the taxpayer seeks the recovery of $20,055.99 claimed to have been overpaid in income taxes and interest for the year 1960, or for such greater amount as may be legally refundable, together with interest thereon. Gertrude H. Saunders is a party only by reason of having filed a joint return with her husband. The plaintiffs are hereinafter referred to as "Saunders" or the "taxpayer".

Saunders has contended throughout that the sum of $67,500 in net proceeds received by him from the sale of certain option rights in 1960 was correctly reported by him as a long term capital gain which should have been taxed accordingly and pursuant to the provisions of the United States Internal Revenue Code then in effect.

The Government has contended: (1) That $67,500 in net amount of the sum of $200,000 received by Saunders on October 11, 1960 was taxable to him in 1960 under Section 61 of the Internal Revenue Code of 1954 as compensation for service rendered; (2) That the value of interest-free loans to Saunders constituted compensation in the year received so as to be taxable under Section 61 of the Code; and alternatively that the release of the option which Saunders held did not constitute a sale or exchange within the meaning of Section 1222 of the Internal Revenue Code.

The parties stipulated and agreed to certain facts which the court finds to be facts (R pps. 96–97) as follows:

1. Taxpayers filed a joint income tax return for 1960 and paid the liability shown to be due thereon in the amount of $12,143.18.

2. Taxpayers were timely assessed an additional tax in the amount of $17,501.-29, plus interest of $2,312.57.

3. This assessment together with accrued interest was paid under protest on September 23, 1963.

4. Taxpayers filed a timely claim for refund on May 12, 1964, for a refund of $20,055.99, or such greater amount as may be legally refundable, together with interest.

5. The claim for refund was formally rejected on October 1, 1964 and this action was timely instituted.

6. Taxpayers reported their income on a calendar year and were on the cash basis of accounting for the year 1960.

7. The Court has jurisdiction over the action pursuant to Title 28 U.S.C.A. § 1346(a) (1).

8. On December 15, 1959, taxpayer and fourteen other investors entered into

a written agreement dated December 15, 1959, covering said parties' agreement to acquire title (to be held in the name of Allan H. Link, as Agent appointed therein) to 29.034 acres of land fronting and lying mauka (mountain-side) of Kapiolani Boulevard, Honolulu, Hawaii, a copy of which agreement was admitted in evidence as plaintiffs' Exhibit "A". As part of this overall transaction, taxpayer also entered into two other agreements, also on December 15, 1959, which respectively assigned certain of taxpayer's rights under plaintiffs' Exhibit A to Ben Gromet and Allan H. Link. These agreements were admitted into evidence as plaintiffs' Exhibits "B" and "C".

9. Plaintiffs' Exhibit "D" is the letter of October 10, 1960 signed by taxpayer and by Jim L. Buck, Agent, pursuant to which taxpayer was paid the sum of $200,000.

10. The sum of $200,000 was received by taxpayer on October 11, 1960 and disbursed by him in the amounts of $75,000 to Ben Gromet and $50,000 to Allan H. Link, in accordance with the terms of said assignments (plaintiffs' Exhibits "B" and "C").

In addition to the foregoing and for a better understanding of the factual situation, the court has found that:

11. During the year 1959 the taxpayer and Mr. Ben Gromet became interested in the purchase of the 29 acre parcel of commercially zoned real estate on Kapiolani Boulevard. The property was then owned by Hialand Development Corporation and was offered to them for purchase at a price of $6,756,000 which the taxpayer and Mr. Gromet considered to be an attractive price. Mr. Saunders approached several individuals and groups seeking financial assistance in the consummation of a transaction of the magnitude involved. Mr. Allan H. Link, named as Agent for the purchasers in the December 15, 1959 agreement, was serving as manager for various business interests of Mr. Norton Clapp and his family. Mr. Clapp was then President of the Weyerhaeuser Company. Among the fourteen other investors

were Mr. Clapp, as trustee for various family trusts, and several of Mr. Clapp's business associates.

12. Under the December 15th agreement a down payment of $1,800,000 was required upon execution of the agreement. A promissory note and first mortgage in the amount of $4,956,000 was executed for the unpaid balance of the sales price by the "owners' group". A first installment payment of $1,000,000 was made on December 15, 1960 leaving a balance of $3,956,000, payable annually on December 15, 1961 through 1963 and the remainder on December 15, 1964. Interest was payable on the unpaid principal at $5\frac{1}{2}\%$ to December 15, 1961 and $6\frac{1}{2}\%$ thereafter. (Tr. 44, 117, 131, 252; Exhibit "D–11").

13. The new ownership in the property was represented by 140 undivided interests, of which taxpayer as a tenant in common with other members of the owners' group was to receive 10.5% of the undivided interests. This interest may also be expressed as a 7.5% undivided interest in the whole parcel. For this interest taxpayer paid into the fund the sum of $25,000 in cash and executed a non-interest bearing promissory note in the sum of $132,500 payable to Allan H. Link, as agent for the "owners' group". As his share of the first installment payment of principal and interest, taxpayer executed another non-interest bearing promissory note in the sum of $95,443.50 also payable to Link as agent. The down payment and first installment contributions by the other members of the owners' group were contributed in cash. (Tr. 73; Exhibits "D–1" and "D–2")

14. Under the terms of the purchase agreement (plaintiffs' Exhibit "A", para. 9, pp. 5–6), the taxpayer was granted a five (5) year option to acquire an additional 20% interest in the real estate involved, which in turn would have proportionately reduced the respective shares of the other owners. The agreement further provided, however, that the option was subject to the condition that Mr. Link, as the "Agent" on

behalf of the owners' group, could purchase the option from the taxpayer after he gave notice of his intention to exercise the option upon payment to him of cash in the sum of $200,000. The taxpayer was under no obligation to his co-tenants to purchase the additional 20% interest, nor were the co-tenants under any obligation to pay the taxpayer any sum whatever, should he elect to exercise his option. The arrangement did contain a built-in feature of protection for the co-tenants to the extent that irrespective of the appreciated value of the property, they could retain their initial interests therein by repurchasing such option from taxpayer for a previously determined maximum sum. The taxpayer elected to exercise his option and gave notice of such intention to the Agent of the owners' group (plaintiffs' Exhibit "D"). Thereafter, and on October 11, 1960, the Agent on behalf of the other owners elected to exercise his repurchase option and paid to the taxpayer the full maximum sum provided by the agreement, e. g., $200,000 rather than part with such portions of their holdings in the property as would have been required in order to convey the additional 20% interest therein to the taxpayer.

15. Referring back again to the inception of the transaction, Link and others of the owners' group did not know Mr. Gromet and therefore preferred to deal with the taxpayer Saunders whom they did know. Saunders and Gromet executed a separate arrangement on December 15, 1959, whereby Gromet advanced the $25,000 to Saunders which in turn became the cash contribution which Saunders made to Link. Gromet accepted Saunders' promissory note for $12,500 and also received an assignment for 50% of Saunders' interest in the property (plaintiffs' Exhibit "B"). On the same day the option granted to Saunders in his own name was immediately transferred and assigned so that Mr. Gromet acquired a 37½% interest in it (plaintiffs' Exhibit "B"), Mr. Allan H. Link, individually and not in his capacity as Agent for the group, acquired a 25% interest, the taxpayer, Saunders, retaining a 37½% interest (plaintiffs' Exhibit "C").

Of the $200,000 which was paid to the taxpayers, Saunders, on October 11, 1960, he retained $75,000 and immediately paid over to Gromet the sum of $75,000 and to Link the balance of $50,000.

As owners, 7½% of the $200,000, or $15,000, was a charge-back against Saunders and Gromet, whereby the $75,000 for each was reduced by one-half of $15,000, or $7,500 each. Thus the net figure of $67,500 was arrived at. (Tr. p. 75)

17. The taxpayer did not receive any direct compensation by way of a finder's fee, sales commission or management fee. The taxpayer was paid professional fees for legal services rendered · in connection with the transaction. Service as the Hawaii representative for the owners' group according to Mr. Link, would have been worth $50,000 per year (first Link Dep. p. 59), but it was apparent that he was discussing the later work to be performed in the development of the property (Tr. p. 241). The taxpayer testified, and the Court so finds, that his work for the co-owners did not include any of the development work (Tr. p. 246), and that his uncompensated services to the co-owners, including himself, were worth $2,000 (Tr. p. 198–199)."

18. The co-owners did not earlier receive any written offers, or even any attractive interest in the property, for the outright sale (first Saunders Dep. p. 34–35) and accordingly were approached during the summer of 1960 on behalf of a proposed development corporation being formed by Saunders and Gromet (first Link Dep. p. 71–72). The proposed corporation, later known as Kapiolani Blvd. Lands, Inc., was formed to purchase the land and to handle the development of the property. Those invited to participate as stockholders were those who it was felt would be good working partners (Daggatt Dep. p. 15–16).

Included in the subscribers' group were Allan H. Link, Ben Gromet and William W. Saunders of the originally named owners (Mr. Link acting in an individual capacity in this instance and not in an agency capacity for the original co-owners). The remaining co-owners did not wish to come in on the development of the land because of the work involved (first Saunders Tr. p. 34) and because they did not wish to take the responsibility in the day to day work and all the headaches that were involved with such a development as was undertaken. (Behnke Dep. p. 18)

19. On October 12, 1960, the owners' group sold its property to the new corporation, Kapiolani Blvd. Lands, Inc., for the sum of $10,800,000 as follows (Exhibit "D–11"):

| | |
|---|---:|
| Cash | $ 50,000 |
| Second Mortgage note | 6,794,000 |
| Total to be paid by Corp. | $ 6,844,000 |
| Assumption by Corp. of Balance Owing by Owners' Group on First Mortgage Note | 3,956,000 |
| Total price to be paid by Corp. | $10,800,000 |

20. On September 1, 1961 (extensions of time granted), taxpayer filed a joint Treasury Form 1041 (U. S. Individual Income Tax Return) for the year ended December 31, 1960 and reported therein a $39,508.21 gain from the sale of property on Schedule D at page 3 of the return. Taxpayer reported the $75,000 which he received as his portion of the option transaction (14 above) as a long term capital gain (plaintiffs' Exhibit "E"). Thereafter and on April 9, 1963, after a series of conferences through and including the Technical Advisor of the Appellate Division of the Internal Revenue Service, plaintiffs' Exhibits "F", "G" and "H" were exchanged which formed the framework of further actions under a proposed assessment by the Internal Revenue Service for a deficiency in the taxes reported and paid by the taxpayer for the year 1960. Pursuant to the correspondence, plaintiffs executed plaintiffs' Exhibit "I" and on June 28, 1963 plaintiffs were assessed an additional federal income tax for the year 1960 in the sum of $17,501.29 plus interest thereon in the further sum of $2,312.57.

21. No part of the sum of $20,055.99 alleged by plaintiffs to have been erroneously and illegally assessed and collected has been refunded to the plaintiffs.

22. Taxpayers' basis for the option was properly reported as zero in 1960, there having been no tax paid or payable upon the receipt of the option rights by the taxpayer in the year 1959. (Tr. p. 64–70, 177–190)

In this case it has been obvious from the outset that the Internal Revenue Service has been sorely grieved and highly offended that any taxpayer could put together a transaction of the nature here portrayed, invest so little in actual cash and receive such huge profits without paying a substantially larger portion thereof to the government in taxes.

The Pretrial Order recites that plaintiffs' theory is that the proceeds received from the sale of certain option rights were correctly treated by plaintiffs as a long-term capital gain and should have been taxed accordingly and pursuant to the terms of the Internal Revenue Code then in effect.

Defendant contended that the $200,000 received by taxpayer and the value of interest on the non-interest bearing notes with which the taxpayer paid in part for his portion of the real property purchased were in substance commissions or compensation for his finding the property and acting as the Hawaii representative for the owners' group. In the alternative, defendant contends that there was no sale or exchange of a capital asset as required for capital gain treatment.

The Pretrial Order (R 97) further presented the Ultimate Issues to be passed upon by the court to be:

1. Whether all or any part of the net account retained by the taxpayer of the

$200,000 payment was taxable as capital gain or ordinary income under the provisions of the Internal Revenue Code of 1954.

2. What part, if any, of the net amount retained by taxpayer of the $200,000 was taxable to him in the year 1960.

By paragraph E the defendant asserted the following issues, but plaintiffs objected that they were not properly issues:

1. Whether the value of interest on the non-interest bearing promissory notes accepted by the owners' group constituted in substance, compensation to taxpayer.

2. If so, what was the amount of that compensation for the year 1960?

From the evidentiary standpoint the case was exhaustively tried. The court literally received all of the evidence presented by either side, noting by reserved and preserved rulings all objections interposed for the record.

 The defendant argued (Post-Trial Brief for the Defendant, p. 13), and the Court concurs, that tax consequences depend on realities and substance rather than form. Commissioner of Internal Revenue v. Court Holding Co., 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981 (1945); Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935); Kuney v. Frank, 308 F.2d 719 (C.A. 9th 1962).

Approached from this concept and stripping the window dressings discussed as "leverage" value of interest or non-interest bearing notes as compensation for services and other rather sophisticated notions, we find that plaintiff on December 15, 1959 acquired a 7½% interest in a certain tract of Honolulu real estate. This interest was divided equally between plaintiff and Mr. Ben Gromet. At the same time plaintiff acquired a 5-year option to purchase an additional 20% interest in the same tract of Honolulu real estate. The option was conditioned, however, to the extent that the maximum profit which plaintiff was likely to realize was a dollar measure of $200,000. The beneficial interest in this option was divided so that plaintiff held 37½%, Ben Gromet held 37½% and Mr. Allan H. Link held 25%. Whether the consideration consisted of money, marbles or chalk, the fact remains that plaintiff acquired one-half of a 7½% undivided interest in a particular piece of real property. Secondly, he acquired a 37½% interest in the right to participate in the additional acquisition of another 20% undivided interest in the same parcel of property. Plaintiff and those contractually associated with him elected to exercise the option to purchase the 20% interest in real estate and so notified the optionors. The right to purchase real estate had been held by the taxpayer for more than six months, e. g., from December 15, 1959 to October 11, 1960. At this point the condition contained in the option itself came into play by the optionors repurchasing this option right and plaintiff received dollars in lieu of real estate.

From an accounting standpoint, plaintiff treated the entire $75,000 which he received as being profit thereby eliminating completely all questions as to his cost factors. It is conceded that the taxpayer exercised a considerable amount of his professional skill and judgment, together with a considerable expenditure of time and effort, in putting this deal together. He was paid no finder's fee. He claimed no real estate brokerage commission or fees other than the legal fees paid to the law firm with which he was associated. The entire tax structure of our nation will have to undergo a complete revamping if individuals are to be taxed upon some measure of what their services were hypothetically worth when rendered irrespective of the actual compensation received therefor.

In this instance the taxpayer had every reason to believe and no doubt did believe that he was creating a potentially successful venture. He was willing to expend his time and efforts and to obli-

gate himself financially in support of his judgment. But he was willing to await the outcome.

Some investors in stocks and bonds are satisfied to deal only in high grade securities and sell for nominal profit. The more venturesome may, for greater risks, and if patient and successful, sell for much more substantial profit. The court is unaware of any theory which dictates that terminal success dictates to tax authorities that they should look back to the inception of the transaction and impose some sort of sanction upon the expertise of the venturer.

Likewise the court is unaware of any law which dictates that an individual must charge for services rendered, much less that such charges must represent the reasonable value thereof. In this case, had plaintiff claimed the reasonable value of his services rendered in 1959 as a cost factor or that a value accrued to him by virtue of the interest-free nature of his notes, which he then sought to capitalize, an entirely different factual situation would be presented. The defendant's Post-Trial Brief beginning on page 8 confuses the development of the property by the corporation formed for that purpose by erroneously implying that the development was by or for the owners' group. Other factual misstatements mentioned in Plaintiffs' Reply Brief have been noted.

The treatment to be accorded this transaction under 26 U.S.C.A. § 1234 appears to be quite forthright. The court does not subscribe to defendant's theory that the case of Milliken v. Commissioner of Internal Revenue, 15 T.C. 243 (1950), affirmed, 196 F.2d 135 (C.A.2d 1952), certiorari denied, 344 U.S. 884, 73 S.Ct. 181, 97 L.Ed. 684 (1952), is analogous to the case at hand. Plaintiffs' Opening Memorandum, pp. 10–12, discusses this case, which was decided under the 1939 Code and prior to the 1954 Code. In view of the factual findings expressed herein, however, the court does not believe that *Milliken* has application to this case.

See Cummins v. United States, 3 AFTR2d 476, Rabkin & Johnson, Federal Income Gift and Estate Taxation, § 34.08(1), page 3470, and see similar cases where payments by landlords to tenants for the repurchase, vacation or surrender of various lease rights described therein were held to be sales or exchanges. Commissioner of Internal Revenue v. Golonsky, et al., 16 T.C. 1450, aff'd 200 F.2d 72 (3rd Cir.) cert. den., 345 U.S. 939, 73 S.Ct. 830, 97 L.Ed. 1366; Commissioner of Internal Revenue v. McCue Bros. & Drummond, Inc., 19 T.C. 667, aff'd 210 F.2d 752 (5th Cir.) cert. den., 348 U.S. 829, 75 S.Ct. 53, 99 L.Ed. 654; Commissioner of Internal Revenue v. Ray, et al., 18 T.C. 438, aff'd 210 F.2d 390 (2d Cir.) cert. den., 348 U.S. 829, 75 S.Ct. 53, 99 L.Ed. 654; and Metropolitan Building Corporation v. Commissioner of Internal Revenue, 9 Cir., 282 F.2d 592.

The court finds therefore that:

(a) The $67,500 in net amount retained by taxpayer of the $200,000 payment was taxable to taxpayer as capital gain and not as ordinary income under the provisions of the Internal Revenue Code of 1954. No portion of the remainder was so taxable to taxpayer.

(b) No value of interest on the non-interest bearing promissory notes accepted by the owners' group constituted compensation to taxpayer.

The court finds in favor of the plaintiffs and against the defendant and that the amount of the judgment shall be computed by the parties and presented forthwith to the court for entry of judgment, which judgment may include the requested refund of $20,055.99, or such greater amount as may be legally refundable, together with interest thereon and costs, as provided by law.

If the parties are unable to agree upon the proper amount of the judgment within a reasonable time after entry of this decision, then a hearing shall be held and further evidence adduced to determine the proper amount of the judgment.