William W. **SAUNDERS** and **Gertrude**
**H. Saunders, Appellees,**

v.

**UNITED STATES of America,**
**Appellant.**

**No. 25099.**

United States Court of Appeals,
Ninth Circuit.

Nov. 1, 1971.
Rehearing Denied Dec. 7, 1971.

Elmer J. Kelsey (argued), Lee A. Jackson, Stanley L. Ruby, Dept. of Justice, Johnnie M. Walters, Asst. Atty. Gen., Washington, D. C., Robert K. Fukuda, U. S. Atty., Honolulu, Hawaii, for appellant.

James H. Lawhn (argued), Dudley C. Lewis, Honolulu, Hawaii, for appellees.

Before KOELSCH, CARTER and KILKENNY, Circuit Judges.

KOELSCH, Circuit Judge:

William W. Saunders and his wife Gertrude brought this suit against the United States to recover $21,897.25, paid pursuant to the Commissioner's determination of deficiencies in their federal income tax for the year 1960.[1] The District Court entered judgment for the Saunders and the United States has appealed.[2]

Saunders, an attorney, has for some time been actively and successfully engaged in real estate development in the State of Hawaii. In October 1959, he and an associate, Ben Gromet, discovered that a 29 acre parcel of land along the northerly side of Kapiolani Boulevard, one of the principal streets in Honolulu, could be purchased at an attractive price. Saunders, being of the opinion that the property was a likely vehicle for a profitable venture, thereupon approached several prospective inves-

---

1. Mrs. Saunders is a party solely because the Saunders filed a joint tax return.

2. The district court opinion appears in 294 F.Supp. 1276 (D.Hawaii 1968).

tors to purchase the property for commercial exploitation. His prospects included Allan Link, the business manager for Norton Clapp, president of one of the world's largest lumber producing corporations.

After extensive negotiations, Saunders received assurances that Clapp and a number of the latter's business associates would join in the proposed venture and, on December 15, 1959, Saunders and the other would-be venturers memorialized their understandings in a detailed written "Agreement." Clapp, as trustee for several family trusts, Clapp's business associates and Saunders, referred to as "Owners," would purchase the real property for the total sum of $6,756,000. Title would be taken in the names of Link as agent for Owners, who were to be tenants in common, Saunders' undivided interest being 7½ per cent of the whole. Of the cash down payment of $1,800,000, Saunders would contribute $25,000 in cash and execute his personal non-interest bearing note for $132,500 to his co-venturers, who would then make up that sum from their own funds.[3] Link, as Owner's agent, was granted a power of attorney to manage the property, require each owner to contribute his aliquot share of the expenses of the property, including deferred payments on the purchase money mortgage and to make the payments. In addition, the Agreement granted Saunders a "Special Option" which extended him the right to purchase for himself, at any time during the five year period commencing December 15, 1959 and ending December 15, 1964, an additional undivided 20 per cent interest in such portion of the property as remained at the time the option was exercised upon payment of 20 per cent of the Owners' investment in the

subject property. However, the Special Option contained this defeasing proviso:

"It is provided, however, that the Agent (i. e., Link) acting on behalf of all of the Owners, may purchase from William W. Saunders his option hereunder, at any time prior to the effective date of exercise thereof and his payment after ten days prior notice to Agent of the full amount owing by Saunders as a result of the exercise of his option, for the sum of $200,000.00 in cash to be paid to William W. Saunders."

Contemporaneously with his execution of the owners' agreement, Saunders also signed two side agreements—one with Gromet and the other with Link. By the one, he assigned to Gromet a 3¾ per cent interest in the real property, together with a 37½ per cent interest in the Special Option, and in return Gromet advanced Saunders the $25,000 used to meet his cash portion of the down payment on the purchase price for the real property; additionally, Gromet released Saunders from any obligation to repay $12,500 of the sum advanced. By the other agreement, Saunders assigned to Link a 25 per cent interest in the Special Option. Thus, to recap, in December 15, 1959, the interests of Owners, Saunders, Gromet and Link in the real property and Special Option were these:

|  | Owners | Saunders | Gromet | Link |
|---|---|---|---|---|
| In the real property | 92½% | 3¾% | 3¾% | — |
| In the Special Option | | 37½% | 37½% | 25% |

During October of the following year, when Saunders gave notice of his intention to exercise the option, Owners, instead of conveying the additional interest in the real property, invoked the proviso in the Special Option and paid Saunders $200,000, which he divided with Gromet and Link. Saunders' net share amounted to $67,500.[4]

---

3. The unpaid balance of the purchase price was evidenced by Link's note in the principal sum of $4,956,000, bearing interest at the rate of 5½ per cent for the first two years, and thereafter at the rate of 6½ per cent per annum on the declining balance, and payable in annual installments of $1,000,000 plus interest, beginning December 15, 1960. Payment was secured by a first mortgage on the real property.

4. Saunders' net gain amounted to $67,500. As an Owner he was chargeable with 3¾% of the $200,000 (or $7500) which Owners paid in lieu of fulfilling the option.

In returning his 1960 income, Saunders reported this amount as a capital gain from the sale or exchange of an option and treated it as a long term capital gain. The Commissioner, however, rejected Saunders' conclusion and treatment; he took the position that the sum represented compensation for finding the property and for services generally and was simply ordinary income.

■ Following the trial, the district court concluded that the parties intended the Special Option to be, and it in fact was, a true option and consequently that "[t]he $67,500 in net amount retained by the taxpayer of the $200,000 payment was taxable to the taxpayer as a capital gain and not as ordinary income under the provisions of the Internal Revenue Code of 1954 (specifically 26 U.S.C. § 1234)."[5] We disagree.

■■ As noted earlier in this opinion, the Special Option contained a defeasance proviso. As a consequence Owners were not bound to sell and convey; they were afforded an alternative. And for that reason the "Special Option" did not create a "privilege or option" entitled to be accorded capital gains treatment by 26 U.S.C. § 1234. That section is limited in application to unilateral agreements which are inflexibly binding upon the purported vendor. Lawler v. C.I.R., 78 F.2d 567, 568 (9th Cir. 1935); Malden Knitting Mills v. C. I.R., 42 T.C. 769, 777 (1964); Blick v. C.I.R., 31 T.C. 611, 622 (1958), aff'd 271 F.2d 928 (3rd Cir. 1959); Moore v. C.I. R., T.C. Memo 1968-266.[6]

---

5. During 1960 26 U.S.C. § 1234, so far as pertinent, read:

   "(a) Treatment of gain or loss.—

   Gain or loss attributable to the sale or exchange of, or loss attributable to failure to exercise, a privilege or option to buy or sell property shall be considered gain or loss from the sale or exchange of property which has the same character as the property to which the option or privilege relates has in the hands of the taxpayer (or would have in the hands of the taxpayer if acquired by him).

   (b) * * *

   (d) Non-application of section.—

   This section shall not apply to * * *

   (2) in the case of gain attributable to the sale or exchange of a privilege or option, any income derived in connection with such privilege or option which, without regard to this section, is treated as other than gain from the sale or exchange of a capital asset * * *."

6. Contrary to Saunders' argument that the use of the phrase "privilege or option" in § 1234 intends that section to focus on something other than the technical contract right defined by the word "option" is Rev.Rul. 58–234, CB 1958–1, p. 279 which states that the terms privilege and option are synonymous and that the term "privilege" is not intended to refer to any different rights or obligations. See also United States Freight Co. v. United States, 422 F.2d 887 (Ct.Cl.1970) holding that § 1234 has no application to bilateral contract rights. If the owners' group had decided to sell the property when Saunders attempted to exercise the option a bilateral contract, resulting from Saunders' offer to purchase and the owner's groups offer to sell would have been created. We also note the absence of any "sale or exchange" of the Special Option which is a prerequisite for capital gain treatment under 26 U.S.C. § 1234.

The Special Option obligated Owners at its election to either (1) sell Saunders a 20% interest in the real property, or (2) pay him $200,000. Payment of the $200,000 fulfilled the one obligation and extinguished the other. But the extinguishment of an obligation does not ordinarily constitute a sale or exchange unless it adds to the obligor's property rights. Compare Holt v. CIR, 303 F.2d 687 (9th Cir. 1962) with CIR v. Golonsky 16 T.C. 1450, aff'd 200 F.2d 72 (3rd Cir. 1952), cert. denied 345 U.S. 939, 73 S.Ct. 830, 97 L.Ed. 1366. Here extinguishment of owners' promise to sell— upon payment of the $200,000—did not enlarge their interest, since Owners in law were never under an obligation to sell. That fact distinguished the instant case from those relied upon by the district court: CIR v. Golonsky, supra; CIR v. McCue Bros. & Drummond, Inc., 19 T.C. 667, aff'd 210 F.2d 752 (2d Cir. 1954), cert. denied 348 U.S. 829, 75 S.Ct. 53, 99 L.Ed. 654; CIR v. Ray, 18 T.C. 438, aff'd 210 F.2d 390 (5th Cir. 1954), cert. denied 348 U.S. 829, 75 S.Ct. 53, 99 L.Ed.

Moreover, the conclusion is manifest, upon a due consideration of the various relevant factors that the so-called Special Option was not a bona fide Commitment by Owners to sell an interest in real property, but instead was in reality a bare promise to pay money cleverly clothed in deceptive legal garb in an effort to effect a tax saving.

Owners were all experienced in business generally and, of course, well counseled in this particular venture; in their opinion the property was a "good buy" at the offered price of $6,756,000. Just how good a buy is demonstrably established by the fact that within ten months following their purchase, owners sold the property in essentially unchanged condition for $10,800,000. This latter sale cannot be attributed to some freak circumstance for it was made to a corporation whose stock was largely held by Owners themselves and, so far as the record shows, no unusual or unexpected change had occurred after the purchase in the general area where the property was situated. Thus, judged in the light of cold business practices—and this of course provides a proper and generally accurate test—the sole logical conclusion is that the Special Option was essentially illusory as an obligation to convey and that what the parties in reality intended, when they settled upon its terms, was the eventual implementation of the proviso. It follows that the moneys received by Saunders constituted ordinary income, taxable as such. United States v. Fairbanks, 95 F.2d 794 (9th Cir. 1938) aff'd 306 U.S. 436, 59 S.Ct. 607, 83 L.Ed. 855 (1938); Wener v. C. I. R., 242 F.2d 938 (9th Cir. 1957); Osenbach v. C. I. R., 198 F.2d 235 (4th Cir. 1952).

The judgment is reversed.

654; Metropolitan Building Co. v. CIR, 282 F.2d 592 (9th Cir. 1960). For an excellent discussion of this subject, see 3B Mertens Law of Federal Income Taxation (1966 Revision) sec. 22.98 pp. 602–604.