ROBERT D. FRASER, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6366–72.    Filed April 15, 1975.

*Leslie G. MacGowan,* for the petitioner.
*Eugene H. Ciranni,* for the respondent.

QUEALY, *Judge:* This proceeding involves a redetermination of a deficiency in income tax asserted against petitioner for the taxable year 1967 in the amount of $35,200.06. As a result of concessions by the parties, the only question presented for decision is whether the petitioner realized a long-term capital gain on account of the receipt of the. sum of $175,000 in consideration of the transfer or relinquishment of petitioner's right or option to an interest in the partnership known as B & D Properties.

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Robert D. Fraser, the petitioner herein, resided in San Francisco, Calif., at the time of filing of the petition herein. Petitioner was a lawyer. Beginning in about 1954, he became

engaged in the development of real property. Petitioner and one Paul Hammarberg, owned all of the stock of Albert Lovett Corp. through which petitioner carried on this business.

The projects developed by the petitioner through Albert Lovett Corp. included the construction and development of apartment projects in the San Francisco Bay area and Hawaii. Subsequently, in 1962 and 1963, the Albert Lovett Corp. experienced financial difficulties and became insolvent. As a result, petitioner also was unable to meet his obligations as they became due.

Simmons Co., a manufacturer, owned an improved tract of 7½ acres in the northern waterfront area of San Francisco (hereinafter referred to as the Northpoint property), which was used for manufacturing and as its offices. The petitioner learned, sometime early in 1963, that the Simmons Co. had decided to dispose of the Northpoint property and to relocate its office and manufacturing facilities elsewhere in the San Francisco Bay area. However, the Simmons Co. wished to consummate the transaction through the exchange of the Northpoint property for a suitable property of like kind in order to avoid any tax on the gain which would otherwise result from an outright sale of the Northpoint property.

Petitioner brought the matter to the attention of Gerson Bakar (hereinafter referred to as Bakar), who had likewise engaged in the development of properties. As a result, petitioner and Bakar jointly initiated negotiations with the Simmons Co. for the acquisition of the Northpoint property. Initially, such negotiations were conducted in the name of the petitioner. Subsequently, Bakar became the party in whose name the negotiations were concluded. Such negotiations resulted in an agreement executed between the Simmons Co. and Bakar under date of June 7, 1963.

Petitioner was not made a party to the agreement on account of his financial difficulties. However, Bakar and the petitioner agreed that the participation would be allocated on the basis of a two-thirds interest to Bakar and a one-third interest to the petitioner.[1]

---

[1] Since petitioner had previously conducted business through Albert Lovett Corp., in which Paul Hammarberg was a costockholder, initially Hammarberg also sought an interest in the Northpoint property.

The agreement between Simmons Co. and Bakar required Bakar to place $50,000 in cash in escrow with a title company, to be paid to the Simmons Co. at the rate of $2,000 per month pending location of a suitable property for replacement of the Northpoint property. Once such a property was located, Bakar (and/or his associates) was required to acquire and to improve the property in accordance with plans and specifications provided by the Simmons Co. to the extent of $2,500,000. Any cost in excess of that amount would be paid by Simmons Co.

On June 19, 1964, a partnership was formed under the name of B & D Properties to develop the Northpoint property. Under the articles of partnership, Bakar and his associates (Al Wilsey and Jack Wilsey) held a 50-percent interest and a group of investors headed by Alexander Drier held a 50-percent interest. Al Wilsey and Jack Wilsey had provided financial support to Bakar in the initial development of the project. The Alexander Drier group was brought in to provide additional financial resources.

A suitable site upon which to construct the new offices and manufacturing facilities of the Simmons Co. was located in San Leandro, Calif. Funds were expended in clearing the site and erecting a suitable facility thereon. The total cost of the replacement property exceeded $3,500,000, of which B & D Properties supplied $2,500,000 and the balance was paid by the Simmons Co. The exchange of the improved property in San Leandro with the Simmons Co. for the Northpoint property was consummated in February 1965.

At the same time, it was necessary for B & D Properties to obtain financing in excess of $3 million to develop the Northpoint property and to construct the facilities incident thereto. Such facilities included an apartment complex, office buildings, a movie theater, restaurants, a bank, a supermarket, and various commercial facilities. The total building costs associated with Northpoint eventually exceeded $10 million.

All the costs incurred in the development of the Northpoint property were borne by or financed by B & D Properties. During the course of the development, there were also changes in the partners doing business as B & D Properties. At all times, however, Bakar recognized and from time to time advised his associates that petitioner was entitled to a participation therein.

Prior to June 2, 1967, the Alexander Drier group was bought out by the remaining partners. On May 18, 1966, an Amended

Statement of Partnership of B & D Properties, filed in the office of the San Francisco County Recorder, listed as partners A. S. Wilsey, A. S. Wilsey, executor of the last will and testament of J. H. Wilsey, deceased, Gerson Bakar, and Wilsey, Bennett Co., a corporation. Subsequently, a small percentage of the partnership was transferred to a Malcolm MacNaughton, Jr., and a 5-percent interest was transferred to Sheldon Gordon, a real estate agent, who negotiated the leases of the Northpoint property. Also, Jack Wilsey died and his interest passed to his estate.

During the course of the development of the Northpoint property, the petitioner did not contribute any funds to the venture. However, petitioner participated in the negotiations with institutional lenders for the purpose of obtaining finances and the negotiations with other prospective participants from whom financing was to be obtained and in the general planning for the development of the property. For all practical purposes, during this stage of the development, the petitioner played the same role as did Bakar in the development. Petitioner received no compensation for such services and, in the event that the petitioner had been unable either to dispose of his right of participation or to become a participant of record, petitioner would have received nothing for his efforts.

Prior to May 1967, petitioner made several attempts to sell his right to participate in the development of the Northpoint property without success. Such efforts were made with the knowledge and consent of Bakar.

In May 1967, petitioner was in need of funds. He offered to sell or to relinquish any right that he might have to participate in the development of the Northpoint property for the sum of $415,000. Following some negotiation, as of May 26, 1967, petitioner and Bakar reached an agreement that the petitioner would be paid $175,000 for the relinquishment of his interest.

A memorandum dated May 26, 1967, was prepared by Bakar's attorney, outlining the terms of the agreement, as follows:

The position of Bob Fraser today is that he has the right to acquire, at original cost, 15.8335% of B & D Properties and since the original capital was $50,000.00, the capital that is associated with this would be $7,916.75. They have agreed to purchase the option from Fraser for $175,000.00. This would mean that the total amount of interest that would change hands would be the $175,000.00 plus the $7,916.75, or $182,916.75. Fraser would get $182,916.75 and he would pay Al Wilsey and the Estate an amount of $7,916.75. Bakar is going to buy 11.9445%. Wilsey-Bennett Co. is going to buy 2.6%. Malcolm

MacNaughton is going to buy 1.289% or the total percent should equal 15.8335%. The dollar amounts to be paid to Fraser would be: Bakar-$83,489.02; Wilsey-Bennett-$94,342.38; Malcolm MacNaughton $5,085.35, or a taotal [sic] of $182,916.75. Fraser, when he gets the $182,916.75 is going to pay the Estate of Jack Wilsey $3,958.38 and he is going to pay Al $3,958.37, and he gets to keep the remaining $175,000.00.

Thereafter, petitioner departed from the United States and left to his attorney and Bakar's attorney the preparation of the documentation required to consummate their agreement.

During the petitioner's absence from the country, his attorney executed on his behalf a document whereby petitioner purported to exercise his option with respect to the interest set forth in the memorandum, and simultaneously to transfer to Bakar, Wilsey, Bennett Co., and Malcolm MacNaughton, Jr., the percentages set forth in said memorandum. With respect to Bakar, the document reads as follows:

WHEREAS, the undersigned, ROBERT D. FRASER, had an option to purchase from A. S. WILSEY and the Estate of J. H. WILSEY, Deceased, a 15.8335% interest in B & D PROPERTIES, a partnership, for the sum of Seven Thousand Nine Hundred Sixteen Dollars and Seventy-Five Cents ($7,916.75); and

WHEREAS, the undersigned is concurrently herewith exercising said option;

NOW, THEREFORE, in consideration of the sum of One Hundred Thirty-Seven Thousand Nine Hundred Eighty-Eight Dollars and Ninety-Six Cents ($137,988.96), receipt whereof is hereby acknowledged, the undersigned does hereby transfer, set over and assign unto GERSON BAKAR an 11.9445% interest in B & D PROPERTIES.

The documents with respect to the interest acquired by Wilsey, Bennett Co. and with respect to Malcolm MacNaughton, Jr., were identical in form.

The petitioner was contacted by his attorney prior to the execution of these documents and objected to the form thereof. However, he instructed his attorney to proceed with the execution thereof. On his return to the United States, petitioner personally executed a set of identical documents.

The gross amount of $182,916.75 received by petitioner was received from the following:

| | |
|---|---|
| Malcolm MacNaughton, Jr. | $14,891.19 |
| Wilsey, Bennett Co. | 30,036.60 |
| Gerson Bakar | 137,988.96 |
| Total | 182,916.75 |

Since petitioner paid a total of $7,916.75 to A. S. Wilsey and the estate of J. H. Wilsey, the net amount received was $175,000.

On his 1967 income tax return, petitioner reported the transaction in issue as follows:

Interest in land at Northpoint, San Francisco Acquired—June 7, 1963—Sold June 1967—Sales price $175,000—Cost (blank)—Long Term Capital Gain $175,000.

In addition, petitioner included the following note on his return:

NOTE REGARDING SALE OF INTEREST IN LAND-SCHEDULE D

Taxpayer believes that the transaction regarding the sale of an interest in land at North Point, San Francisco, on Schedule D is correctly reported therein, notwithstanding the existence of contrary documentation.

Petitioner also deducted as a miscellaneous deduction in his 1967 income tax return an architect fee pertaining to B & D Properties in the amount of $1,000.

## OPINION

The petitioner had participated in the development of several large real estate projects. Early in 1963, he learned that the Simmons Co. was interested in exchanging its Northpoint property for a new location in the San Francisco Bay area. He became interested in the possibility of developing the Northpoint property. Petitioner initiated negotiations with the Simmons Co. in order to arrive at an agreement which would enable him to proceed. However, petitioner was under a disability on account of his financial condition. His former development company was in bankruptcy. It was difficult, if not impossible, for him to undertake any project in his own name. Accordingly, he enlisted the aid of one Gerson Bakar, who was also interested in real estate development. Bakar took over the negotiations.

As a result of these negotiations, a plan was consummated whereby suitable property was located and a building constructed thereon for the Simmons Co. which was then exchanged for the Northpoint property. This was followed by the development of the Northpoint property. The developer of record was B & D Properties, a partnership composed of Bakar and various associates, exclusive of the petitioner. Due to his financial situation, he could not then become a participant in the venture. An agreement was entered into between petitioner and Bakar

that petitioner would have the right to participate to the extent of a proportionate interest.

From the time of the initiation of negotiations until May 1967, petitioner was active in negotiating the agreement, obtaining financing, obtaining additional partners with capital to invest, and the planning of the development of the Northpoint property. He had no interest therein of record and received no compensation for such services.

During 1964 and 1965, petitioner made several efforts to sell his right to participate in the Northpoint property development to third parties. Finally, in May 1967, petitioner proposed that Bakar acquire this right for $415,000. After some negotiation, the parties agreed upon a price of $175,000. That agreement was embodied in a formal set of documents whereby petitioner purported to exercise his option to acquire a partnership interest of 15.8335 percent in B & D Properties and to sell such interest simultaneously to Gerson Bakar, Wilsey, Bennett Co., and Malcolm MacNaughton, Jr.

Respondent argues that the sum of $175,000 received by petitioner constituted payment for services and is taxable as ordinary income.[2] In the alternative, respondent argues that the petitioner exercised an option to acquire interest in the partnership and thereupon sold that interest realizing a short-term capital gain. With respect to the former, respondent's position is predicated on the contention that petitioner did not have a capital asset because petitioner did not acquire a property right under the laws of the State of California. The agreement may have been voidable under the California statute of frauds, but that defense is only available to the parties. See *E. E. Hassen*, 63 T.C. 175, 186 n. 6 (1974); *J. N. Wheelock*, 16 T.C. 1435 (1951); *Francis M. Camp*, 21 B.T.A. 962 (1930).

The facts are that petitioner participated in the acquisition and development of the Northpoint property just as if he were a partner or joint venturer with Bakar. He received nothing for his efforts. However, it was clearly understood that petitioner would

---

[2] Since any option extended to petitioner was granted no later than June 3, 1963, respondent has not argued that petitioner realized compensation income on the sale of a compensatory option, pursuant to secs. 1.61–15(a) and 1.421–6(d)(3) of the regulations. See sec. 1.61–15(d), Income Tax Regs. Neither has respondent argued that petitioner realized compensation under the authority of *Commissioner v. LoBue*, 351 U.S. 243 (1956). But cf. T.I.R. 490, dated July 11, 1963, reprinted at 7 C.C.H. Std. Fed. Tax Rptr. par. 6511 (1963).

be entitled, if his financial circumstances improved, to take over an interest in the partnership predicated on the original two-for-one ratio between Bakar and the petitioner, which had become diluted by reason of the participation of third parties. Bakar confirmed this agreement.

In response to interrogation by respondent's counsel, Bakar testified:

MR. CIRANNI: To your knowledge, was, between 1963, say April of 1963 and June 2nd, 1967, was Mr. Fraser a partner in B&D partnership?

A No, he was not.

Q From June 2nd, 1967 to the present date, was Mr. Bakar—Fraser ever a partner in B&D Properties?

A No, he was not.

Q You understand, Mr. Bakar, I'm asking you some of the same questions I'm asking—I asked Mr. Wilsey.

A Yes.

Q Is it your understanding that the option, that so-called option that Mr. Fraser had was an oral option?

A Yes.

Q There was an oral option agreed to between Mr. Bakar and you—Mr. Fraser and you?

A Well, I was aware of it and I carried the message to Mr. Wilsey that there was a call on that—those percentage points that have been described.

Q But, who negotiated the option? Was the option negotiated by you and Mr. Fraser?

A You're talking about at the time of exercising?

Q No, sir, I'm talking about when the option arose.

A Yes. Affirmative.

Q That arose as a result of the conversation between you and Mr. Fraser?

A Affirmative.

Q Do you consider this obligation that you had, do you consider that a moral obligation?

A Yes.

Q You used the term once 'a gentlemen's agreement'; you considered it a gentleman's obligation?

A It was an obligation. You may put any term to it you want, Counselor.

Q I'm asking, though, what term you put to it, Mr. Bakar.

A I would say moral, gentlemen's agreement and legal.

A. S. Wilsey testified that he was also cognizant of this agreement. Furthermore, Bakar and the other partners, who acquired petitioner's rights, were willing to pay something in satisfaction of the petitioner's right to participate.

In our opinion, the record in this case clearly establishes that petitioner at all times had an inchoate right or "option" pursuant to a verbal agreement to become a partner in B & D Properties

pursuant to an agreement with Bakar, the sole requirement being that petitioner contribute his proportionate share of the original investment of $50,000 made by Bakar when the right to exchange other property for the Northpoint property was first acquired from Simmons Co. That such right or option might constitute a capital asset is equally clear. See *Saunders v. United States*, 450 F. 2d 1047 (9th Cir. 1971).[3]

For the petitioner to prevail, however, it is incumbent upon the petitioner to establish first that, irrespective of the form of the transaction, petitioner did not exercise his right or option to become a partner in B & D Properties and simultaneously sell that interest to the other partners; and, secondly, that the sale or relinquishment of petitioner's inchoate right or option to participate in the development of the Northpoint property, as a partner in B & D Properties, resulted in the sale of a capital asset held for more than 6 months.[4]

In determining whether the transaction resulted in the sale of the option or whether there was an exercise of the option and simultaneous sale of the property interest acquired thereby, the courts are not bound by the form of the transaction. See, e.g., *Miller v. Commissioner*, 295 F. 2d 538 (8th Cir. 1961); *Barber v. United States*, 215 F. 2d 663 (8th Cir. 1954), cert. denied 348 U.S. 897 (1954); *Louis D. Blick*, 31 T.C. 611 (1958).

It is clear from the record in this case that the petitioner did not at any time intend to exercise his right to become a partner. The circumstances which made it impractical, if not impossible, for the petitioner to participate in the venture at the outset, had not changed. The petitioner's financial condition had not improved materially. For that reason, in the negotiations preceding the payment of $175,000 to petitioner, he was merely seeking to convert his so-called "option" into cash. In fact, petitioner had made efforts in the past to sell that right. That

---

[3] In the *Saunders* case the partners had reserved the alternative right to pay Saunders a specified sum in lieu of permitting him to become a partner, thereby changing the character of his so-called option.

[4] Sec. 1234, I.R.C. 1954, provides, in part:

(a) TREATMENT OF GAIN OR LOSS.—Gain or loss attributable to the sale or exchange of, or loss attributable to failure to exercise, a privilege or option to buy or sell property shall be considered gain or loss from the sale or exchange of property which has the same character as the property to which the option or privilege relates has in the hands of the taxpayer (or would have in the hands of the taxpayer if acquired by him).

Respondent does not dispute the fact that the "property" involved, i.e., a participation in the partnership or syndicate, would qualify as a capital asset.

was all that the petitioner intended in offering his interest to Bakar.

The form of the transaction, whereby petitioner purported to exercise his option and, in the same instrument, to sell a specified interest in the partnership to the designated purchasers was obviously designed for the convenience of the purchasers to enable them to reallocate the partnership interests in accordance with their prearranged agreement.

On the other hand, since petitioner's option was, in fact, utilized to realign the partnership interests, the transaction was more than a mere cancellation of the option. In order to achieve the result sought by the purchasers, there had to be a "sale or exchange" of the petitioner's "interest" within the meaning of section 1234(a).[5] Cf. *Holt v. Commissioner*, 303 F. 2d 687 (9th Cir. 1962); *Isadore Golonsky*, 16 T.C. 1450 (1951), affd. 200 F. 2d 72 (3d Cir. 1952); *McCue Bros. & Drummond, Inc.*, 19 T.C. 667 (1953), affd. 210 F. 2d 752 (2d Cir. 1954).

We are struck by the similarity between petitioner's case and the case of *Saunders v. United States, supra*. In the *Saunders* case, the taxpayer was a lawyer and a developer. He discovered that a valuable tract of property could be purchased. He got together a syndicate to purchase and develop it. In consideration for his services, the taxpayer was given an option to acquire an additional interest in the syndicate at cost. However, the option agreement provided that if the taxpayer elected to exercise his option the other participants could pay him a specified amount in lieu of giving him the additional participation. When the taxpayer attempted to exercise his option, the other participants paid him off in cash. The taxpayer claimed that he had sold his option thereby realizing a long-term capital gain. The District Court held for the taxpayer. In reversing, the appellate court said:

As noted earlier in this opinion, the Special Option contained a defeasance proviso. As a consequence Owners were not bound to sell and convey; they were afforded an alternative. And for that reason the "Special Option" did not create a "privilege or option" entitled to be accorded capital gains treatment by 26 U.S.C. § 1234. That section is limited in application to unilateral agreements which are inflexibly binding upon the purported vendor. Lawler v. C.I.R., 78 F. 2d 567, 568 (9th Cir. 1935); Malden Knitting Mills v. C.I.R., 42 T.C. 769, 777

---

[5] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

(1964); Blick v. C.I.R., 31 T.C. 611, 622 (1958), aff'd 271 F.2d 928 (3rd Cir. 1959); Moore v. C.I.R., T.C. Memo 1968–266. [Fn. ref. omitted.]

The facts in petitioner's case are, in all respects save one, indistinguishable from the facts in the *Saunders* case. The agreement between petitioner and Bakar did not provide for a cash payment in lieu of participation in the development. As we read the *Saunders* case, that distinction requires a decision for the petitioner.

In conclusion, the testimony of all of the parties clearly establishes that petitioner had an option to participate in the development of the Northpoint property. As a result of negotiations with Bakar, petitioner sold that right to certain designated participants who thereupon allocated among themselves the interest to which the petitioner was otherwise entitled. Petitioner received $175,000 in consideration for the sale of his option, not by prearrangement as in the case of *Saunders v. United States, supra,* but by negotiation. The transaction thus qualifies as the sale or exchange of an option held for more than 6 months, relating to a capital asset within the meaning of section 1234, on account of which petitioner realized a long-term capital gain.

*Decision will be entered for the petitioner.*