TOM H. HOLMES, JR. and PAT A. HOLMES, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Holmes v. Commissioner
Docket No. 9839-76.
United States Tax Court
T.C. Memo 1978-437; 1978 Tax Ct. Memo LEXIS 77; 37 T.C.M. (CCH) 1825; T.C.M. (RIA) 78437; November 2, 1978, Filed *77 Richard Lee Brown, for the petitioners. John F. Dean, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined a deficiency in petitioners' Federal income tax in the amount of $ 9,514.53 for the taxable year 1972. The sole issue for our decision is whether $ 52,500 received by petitioners under an agreement restricting the sale of Granbury State Bank stock should be taxable as ordinary income in the year of receipt. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts along with the attached exhibits are incorporated by this reference. Mr. Tom H. Holmes, Jr. (herein petitioner), and his wife Pat A. Holmes, resided in Granbury, Texas, at the time of their filing the petition in the instant case. They filed their Federal joint income tax return for the taxable year 1972 with the Internal Revenue Service Center, Austin, Texas. Prior to June 9, 1972, petitioner owned 11,700 shares of stock in Granbury State Bank (herein Granbury). Granbury is a state bank chartered in the State of Texas with its principal offices in Granbury, Texas. During the taxable year *78 1972 Granbury had 40,000 shares of stock issued and outstanding. In addition to the shares issued to petitioner, Dr. L. G. Ballard owned 11,750 shares of Granbury prior to June 9, 1972. During May 1972 Dr. Ballard notified petitioner of his desire to sell his 11,750 shares in Granbury for $ 20 per share or $ 235,000. Petitioner was not in a financial position to purchase Dr. Ballard's stock so he set out to find prospective buyers, as did Dr. Ballard. During May 1972 petitioner located Mr. Ben Sudderth who agreed to buy Dr. Ballard's stock for $ 263,500 or $ 22.43 per share. Following the negotiations between petitioner and Mr. Sudderth, petitioner arranged with Dr. Ballard for the sale of Dr. Ballard's stock for $ 235,000 or $ 20 per share. Pursuant to this arrangement Mr. Sudderth issued his personal check on June 5, 1972, in the amount of $ 1,000 and payable to Dr. Ballard. He gave the check to petitioner who in turn transferred it to Dr. Ballard. By making the $ 1,000 payment Mr. Sudderth purchased the right to buy Dr. Ballard's stock for $ 235,000. This right existed for a period of seven days after the date of the $ 1,000 payment. After Dr. Ballard received the $ 1,000 *79 payment from Mr. Sudderth petitioner again discussed the purchase price of the stock and as a result of this discussion Dr. Ballard agreed to sell his stock for a total purchase price of $ 211,500 or $ 18 per share. Petitioner then sought the necessary financing which would enable Mr. Sudderth to consummate the stock purchase. Pursuant to negotiations with the National Bank of Commerce, Dallas, Texas, petitioner's efforts produced a substantial portion of the needed financing. The balance of the financing came from Granbury and through the efforts of Mr. Sudderth from the Farmer's and Merchant's Bank in DeLeon, Texas, which was a bank with which Mr. Sudderth had an established line of credit. On June 9, 1972, Dr. Ballard and Mr. Sudderth entered into an agreement whereby Mr. Sudderth paid $ 211,500 for Dr. Ballard's Granbury stock. Mr. Sudderth made the payment through petitioner who was present on the date of the sale and actual transfer of the stock. Prior to this time Mr. Sudderth relied upon petitioner for information concerning the purchase and sale of Dr. Ballard's stock as well as the financing needed to effectuate the sale. The only occasion on which Mr. Sudderth met with *80 Dr. Ballard occurred on June 9, 1972. During the negotiations for the purchase of the stock Mr. Sudderth and petitioner agreed to enter into a collateral agreement which would restrict any future sale of Granbury stock owned by either Mr. Sudderth or petitioner. They entered into this agreement on June 9, 1972. The agreement, entitled Agreement Restricting Transfer and Disposition of the Stock of Granbury State Bank, Granbury, Texas, provided in pertinent part: (4) Sales. In the event Tom Holmes or Ben D. Sudderth desires to sell, assign, transfer, or otherwise dispose of all or any part of his shares, he shall obtain a written offer to acquire such stock signed by the person desiring, in a bona fide transaction, to acquire such stock. The terms of any such offer shall provide that payment will be made in cash or its equivalent at the time of closing, and the offer shall state a price in lawful money of the United States, and shall include an agreement by the prospective purchaser, that, if the offer is accepted, the purchaser will promptly execute and deliver to the other party to this instrument a suitable agreement by which he agrees that the shares purchased will remain *81 subject to this agreement and that he will be bond by the terms of this agreement just as if he had been one of the original parties to it. The stockholder desiring to dispose of his stock shall furnish to the other party to this instrument a true copy of such offer, together with a written offer by the party desiring to sell his stock offering to sell such shares to the other party to this instrument at the same price. Upon receipt of such offer, communication and information heretofore required the party receiving same shall have ten (10) days in which to notify in writing the party offering such shares for sale of his desire to purchase same and shall accompany his acceptance with a cashiers check or money order in the amount of five per cent of the purchase price payable to the cashier of the Granbury State Bank, Granbury, Texas, as escrow money to show his good faith. Upon receipt of the acceptance and escrow money by the party desiring to sell his shares, such party shall immediately deliver the escrow money to the cashier of the Granbury State Bank, Granbury, Texas, to be dispersed and paid to the party desiring to sell his shares upon transfer of his shares to the other *82 party to this instrument, the same being the party desiring to purchase such shares, as part of the purchase money for such shares and contemporaneous therewith the balance of the purchase price shall be paid to the party selling his shares in cash. The transfer and sale of the shares of stock of the party desiring to sell and the payment of the balance of the purchase price due therefor shall be completed within ten (10) days after date of receipt of offer and escrow money as hereinabove provided for. Should the party receiving the offer to sell fail to accept the offer in writing and accompany same by a cashier check or money order for the amount of escrow money required within the time heretofore specified, then the party desiring to sell his shares shall be fully authorized and empowered to transfer and sell his shares to the third party which made the offer on the terms set out in such offer that was communicated to the other party to this instrument. Should the offer to purchase by such third party and the proposed sale fail to close within ten (10) days after the time for the other party to this instrument to accept the offer expires, thereafter the party desiring to sell *83 his stock shall be required to comply again with the procedure set forth in this paragraph before making any sales or other disposition. In addition the agreement required the stock of both Mr. Sudderth and petitioner to be marked in a manner which would indicate that the stock was subject to restrictions upon transfer by either party and all subsequent holders of the stock. Finally the agreement provided for a termination upon the mutual agreement of the parties or upon the expiration of a twenty-year period after its effective date of June 9, 1972. Petitioner received $ 52,500 from Mr. Sudderth during the taxable year 1972 in consideration for the obligation created under the agreement as provided in paragraph (4) which is set out above. Mr. Sudderth did not receive any money from petitioner for the same obligation which bound him under the agreement. Dr. Ballard had no knowledge of this agreement. [1]
On his Federal joint income tax return for the taxable year 1972, petitioner reported the $ 52,500 as a capital gain. The Commissioner, in his statutory notice of deficiency, *84 determined that the $ 52,500 received by petitioner pursuant to his agreement with Mr. Sudderth was taxable as ordinary income rather than as a capital gain. Correspondingly, the Commissioner decreased the capital gain reported by petitioner in the amount of $ 26,500 due to his determination with respect to the ordinary income treatment applied to the $ 52,500. OPINION The issue for our decision is whether $ 52,500 received by petitioner under an agreement restricting the sale of stock should be taxable as ordinary income in the year of receipt. Petitioner and Dr. Ballard owned stock in the Granbury State Bank, Granbury, Texas, in the respective amounts of 11,700 shares and 11,750 shares. Dr. Ballard notified petitioner that he wanted to sell all of his Granbury stock for $ 20 per share. Petitioner was financially unable to purchase the stock but through his efforts arranged for the sale of Dr. Ballard's stock to Mr. Ben Sudderth. Mr. Sudderth conducted all of his negotiations with petitioner and agreed to pay $ 263,500 as the total consideration for the stock. Petitioner then assisted Mr. Sudderth in securing adequate financing necessary to consummate the purchase of Dr. *85 Ballard's stock. Upon further negotiations with petitioner Dr. Ballard agreed to accept Mr. Sudderth's payment of $ 1,000 which gave Mr. Sudderth the right to purchase Dr. Ballard's stock for $ 20 per share or $ 235,000 for the total purchase price. The payment of $ 1,000 was made on June 5, 1972, by petitioner's delivery of Mr. Sudderth's personal check to Dr. Ballard. By making this payment Mr. Sudderth's right to purchase the stock at the agreed price terminated seven days after June 5, 1972. Following the acceptance of Mr. Sudderth's check, petitioner informed Dr. Ballard that Mr. Sudderth would purchase the stock for $ 18 per share rather than the previously agreed amount of $ 20 per share.On June 9, 1972, Dr. Ballard sold his 11,750 shares of Granbury stock to Mr. Sudderth for $ 211,500 or $ 18 per share. Mr. Sudderth paid the balance of the original amount ($ 263,500) he was willing to pay for the stock to petitioner under an agreement entitled Agreement Restricting Transfer and Disposition of the Stock of Granbury State Bank, Granbury, Texas.Under this agreement Mr. Sudderth and petitioner mutually agreed to abide by certain principles restricting the sale or disposition *86 of their respective shares of Granbury stock as set forth in more detail in our findings of fact. Mr. Sudderth did not receive any money for the obligation he assumed pursuant to the agreement. Petitioner contends that he received $ 52,500 from Mr. Sudderth in the form of a premium paid for an option to purchase his stock and, therefore, none of the $ 52,500 received by him during the taxable year 1972 is taxable. Petitioner relies upon Rev. Rul. 58-234, 1958-1 C.B. 279 which provides at page 283: "It is manifest, from the nature and consequences of 'put' or 'call' option premiums and obligations that there is no Federal income tax incidence on account of either the receipt or the payment of such premiums, i.e., from the standpoint of either the optionor or the optionee, unless and until the options have been terminated, by failure to exercise, or otherwise, with resultant gain or loss." Petitioner argues that he received no taxable income with respect to the option premium during 1972 because no stock was offered or sold by petitioner to Mr. Sudderth, the agreement concerning the stock did not lapse, and the agreement was not terminated by the mutual consent of the *87 parties. Therefore, petitioner takes the position that no closed transaction, with respect to the premiums paid under his agreement with Mr. Sudderth, arose during the taxable year 1972. For these reasons petitioner argues that he is entitled to a refund for the taxable year 1972 in the amount of $ 12,453.31. [2]
Petitioner has the burden of proof and must establish that his receipt of $ 52,500 from Mr. Sudderth during the taxable year in issue is not taxable as ordinary income as determined by the Commissioner. Welch v. Helvering,290 U.S. 111 (1933); Rule 142, Tax Court Rules of Practice and Procedure. In an effort to do so petitioner characterizes the $ 52,500 received from Mr. Sudderth as an option premium.The basis of petitioner's position is founded *88 in the agreement he entered into with Mr. Sudderth on June 9, 1972. While petitioner argues that this agreement is evidence of an option contract we must look to the overall circumstances in order to determine the true substance of the agreement. Blackstone Realty Co. v. Commissioner,398 F.2d 991 (5th Cir. 1968); Commissioner v. Court Holding Co.,324 U.S. 331 (1945). In addition petitioner relies upon Commissioner v. Dill Co.,294 F.2d 291 (3d Cir. 1961), and Ling and Company v. Trinity Savings and Loan Association,482 S.W. 2d 841 (1972), for the proposition that no gain is recognized from the receipt of an option premium unless and until the option has terminated by failure to exercise or otherwise terminate. However, petitioner in so relying presumes that Mr. Sudderth paid $ 52,500 for an option to buy Granbury stock from petitioner. Therefore, the threshold consideration is whether Mr. Sudderth acquired an option to buy petitioner's stock under the agreement dated June 5, 1972. An option is the creation of *89 an obligation by which one binds himself to sell and leaves it discretionary with the other party to buy. In other words, an option is a contract by which the owner of property agrees with another that he shall have the right to buy the property at a fixed price within a time certain. 1 Williston Law of Contracts, sec. 61A (3d ed. 1957). This creates an irrevocable offer on the part of the owner and at the same time grants the purchaser a choice of whether or not to buy the property at the specified price within the specified time. By contrast, the agreement upon which petitioner relies does not create an irrevocable offer of Granbury stock on the part of petitioner. Petitioner and Mr. Sudderth merely agreed that in the event either party decided to sell or dispose his respective stock the other party had the right to decide whether or not to buy the stock. In the event the party decided not to purchase the stock the owner was free to sell to whomever he chose. It is well settled that an option is limited to unilateral agreements which inflexibly bind the owner of property. *90 Saunders v. United States,450 F.2d 1047 (9th Cir. 1971); Malden Knitting Mills v. Commissioner,42 T.C. 769 (1974); Blick v. Commissioner,271 F.2d 928 (3d Cir. 1959); Lawler v. Commissioner,78 F.2d 567 (9th Cir. 1935). The agreement in the instant case did not inflexibly bind petitioner to offer his stock for sale to Mr. Sudderth for a stated price within a fixed time period. Therefore, we find that petitioner did not receive $ 52,500 during the taxable year 1972 as an option premium. Accordingly, we need not address ourselves to petitioner's argument relating to the open transaction doctrine because his argument is based upon the existence of an option contract with Mr. Sudderth. We, therefore, find that petitioner has failed in his burden of proving that the Commissioner's determination is erroneous. Decision will be entered for the respondent.
Footnotes
1. During August 1973 Mr. Sudderth sold his 11,750 shares of Granbury stock to petitioner.↩
2. Petitioner's calculation is based upon: (1) the fact that he overstated his taxable income for the taxable year in issue in the amount of $ 26,500; (2) his payment of Federal income tax in the amount of $ 21,275.26 for the taxable year in issue; and (3) the elimination of the receipt of the option premium which reduces his income tax liability to the amount of $ 8,822.05 for the taxable year in issue.↩